[Cite as *State v. Brown*, 2009-Ohio-5428.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO. 9-09-15

     v.

JOHN E. BROWN,                       O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 08-CR-359

Judgment Affirmed

Date of Decision: October 13, 2009

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Brent W. Yager* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, John E. Brown, appeals the February 10, 2009 judgment of the Common Pleas Court of Marion County, Ohio, finding him guilty of three counts of gross sexual imposition and one count of burglary and sentencing him to an aggregate sentence of twelve years and six months of imprisonment.

{¶2} The facts relevant to this appeal are as follows. In August of 2007, Brown (who goes by the name "Bill") met the victim, L.B., at an assisted living complex in Marion, Ohio, called "The Sterling House," where he worked as a maintenance man. L.B.'s mother had recently begun living at the Sterling House in the memory care area because she was suffering from Huntington's Disease. Over the next year, L.B., who is thirty-three-years-old but is mentally challenged, would visit her mother nearly every day with her father, William. During these visits, William would feed and care for his wife, while L.B. would mingle with the staff and other residents in the facility in the living room area. L.B. also volunteered at The Sterling House with the activities by doing simple tasks such as passing out bingo cards to residents, setting up chairs, and placing craft materials on the tables.

{¶3} On September 1, 2008, L.B. did not go with William to visit her mother because she was tired and not feeling well. Instead, she remained at the

home she shared with her father on Harding Highway in Marion County, Ohio. When William arrived at the Sterling House, Brown was working. At some point, Brown asked William where L.B. was, and William told him she did not feel well and was at home. Brown left the Sterling House a few minutes after the noon hour, while William was still caring for his wife.

{¶4} Shortly after leaving the Sterling House, Brown began traveling in the direction of L.B.'s home. Brown stopped at the home, and L.B. allowed him into the home. According to Brown's testimony, he sat next to L.B. on the living room couch, and the two began looking at a music CD and pictures in a newspaper. At some point, L.B. reached over to Brown and touched his leg. She then touched his penis over his clothing, began fondling it, and said, "Nice." He then asked her if she wanted to see it, and she said, "Yes." Brown exposed his penis, and L.B. touched it again and said, "Nice." Brown further testified that L.B. removed her pants and underwear. She also lifted her shirt. When she raised her shirt, Brown ran his hand along her breast and said, "Nice." Brown also testified that he touched L.B.'s vagina with his penis but denied that any penetration occurred.

{¶5} William, who normally visited with his wife for some time after feeding her lunch, left the Sterling House early that day because his wife did not feel well and wanted to rest. When he arrived home around 12:30 p.m., he noticed

-3-

an unfamiliar Jeep Wrangler in his driveway. Upon entering the home through the garage, he found Brown in the living room zipping up his pants and L.B. sitting on the couch with her pants and underwear down. Brown immediately told William that nothing happened and that it was not what William was thinking. He also repeatedly asked William, who was quite upset, to not call the police. William told Brown to stay where he was, and Brown remained in the home while William called the Marion County Sheriff's Office.

{¶6} Officers with the Sheriff's Office arrived on scene shortly thereafter. Deputy Thomas Miller arrived first and directed Brown to step into the garage to speak with another officer. Dep. Miller then attempted to speak with L.B. but was unsuccessful as she would not talk to him. He asked her several times if she was okay, and L.B. finally answered, "Yes," but gave him no further information. He then briefly spoke with William about L.B.'s condition and instructed William to remain with her while he went to the garage and made contact with Lieutenant Jeff Cline, who was speaking with Brown about what had transpired.

{¶7} Brown initially denied that he touched L.B. in any way. However, he later admitted that the "did touch her around the groin area and her hair." (Trial Trans. p. 378.) He also told Lt. Cline that L.B.'s mental age was about seven or eight-years-old and that she did not communicate very well but rather answered things in one word answers or pointed to things. After this brief discussion,

Brown agreed to accompany the officers to the Sheriff's Office for a more formal interview.

{¶8} L.B. was taken to Marion General Hospital, where she underwent a sexual assault nurse examination ("SANE"). Prior to the examination, the SANE nurse spoke with L.B. L.B. used her teddy bear to indicate where she was touched and told the nurse, "He touched pee-pee." When asked, "Who," L.B. replied "Bill." She also stated that Bill touched her "pee-pee" and pointed to her vaginal area. L.B. further revealed, "He put his pee-pee in pee-pee," and again pointed to her vaginal area.

{¶9} During the examination, the SANE nurse took numerous swabs from L.B.'s vaginal and anal areas. She also noted a one-inch abrasion, which was bleeding, on the inside of L.B.'s vagina, behind her hymen. The nurse collected L.B.'s clothing and eventually gave the clothing, along with the swabs, to law enforcement.

{¶10} While L.B. was being examined at the hospital, Brown was interviewed at the Sheriff's Office by Lt. Cline. In this recorded interview, Brown repeated what he told Lt. Cline in the garage about what had transpired between him and L.B. He also admitted to ejaculating on the floor in front of the couch and to then touching L.B.'s vagina with his penis. After speaking with the officers, Brown agreed to go to the hospital for an examination.

{¶11} Brown went to Marion General Hospital. Dep. Miller followed him there. The hospital was busy, and Brown was informed by hospital staff that it was going to be hours before he could be seen. A call was placed to Lt. Cline, and Brown asked if he could get something to eat and return later for the examination. Lt. Cline told him that although he preferred that Brown wait, he could not force him to stay. Brown left but later returned to the hospital, where the medical records indicated his examination began at 6:30 p.m. As a part of the examination, oral, penile, and anal swabs were taken from Brown. These swabs were later delivered to law enforcement.

{¶12} The Bureau of Criminal Identification and Investigation ("BCI") later examined the swabs taken from both Brown and L.B. Seminal fluid was found on L.B.'s anal and vaginal swabs and in her underwear. However, a DNA profile was unable to be obtained from this fluid due to a lack of spermatozoa within the seminal fluid. BCI was able to obtain a DNA profile from Brown's penile swab. Both Brown's DNA and L.B.'s DNA were found on the penile swab.

{¶13} On September 17, 2008, Brown was indicted for three counts of gross sexual imposition in violation of R.C. 2907.05(A)(5), each a felony of the fourth degree; one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree; and one count of aggravated burglary in violation of R.C. 2911.11(A)(1), also a felony of the first degree.

{¶14} The case proceeded to a jury trial on December 15-17, 2008. After the presentation of the State's case-in-chief, the defense made a motion for acquittal, pursuant to Crim.R. 29, on each count, which was overruled by the trial court. The defense then presented its case, and closing arguments and jury instructions were given. The jury was instructed on all five counts of the indictment and on the lesser included offense of burglary, a second degree felony in violation of R.C. 2911.12(A)(1). Thereafter, the jury found Brown guilty on all three counts of gross sexual imposition, not guilty on the rape and aggravated burglary charges, and guilty of the lesser included offense of burglary.

{¶15} On February 9, 2009, Brown was sentenced. The trial court sentenced him to eighteen months in prison on each of the three gross sexual imposition counts and to eight years in prison on the burglary count. These counts were ordered to be served consecutively to one another for an aggregate total of twelve years and six months imprisonment. This appeal followed, and Brown now asserts three assignments of error.

### ASSIGNMENT OF ERROR I

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTIONS FOR GROSS SEXUAL IMPOSITION.**

### ASSIGNMENT OF ERROR II

**THE COURT ERRED TO THE PREJUDICE OF DEFENDANT- APPELLANT BY SENTENCING HIM ON**

**THREE CONVICTIONS FOR GROSS SEXUAL IMPOSITION.**

**ASSIGNMENT OF ERROR III**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR BURGLARY.**

{¶16} For ease of discussion, we elect to address the first and third assignments of error together.

*First and Third Assignments of Error*

{¶17} In his first assignment of error, Brown maintains that the evidence was insufficient to support the three counts of gross sexual imposition. Brown also asserts in his third assignment of error that the evidence was insufficient to sustain his conviction for burglary. Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

{¶18} Upon review of the record, we find that Brown made his Crim.R. 29 motion at the close of the state's case, proceeded to present evidence on his behalf, and then failed to renew his motion for acquittal at the conclusion of all of the evidence. Thus, he has waived all but plain error as to the sufficiency of the evidence. See *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163, 2001-Ohio-57. In order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. *Id.*

{¶19} To prove the charges of gross sexual imposition, the State had to show that Brown purposely had sexual contact with L.B., who was not his spouse, when L.B.'s ability to resist or consent was substantially impaired because of a mental condition, and Brown knew or had reasonable cause to believe that L.B.'s ability to resist or consent was substantially impaired because of her mental condition. See R.C. 2907.05(A)(5).

{¶20} Specifically, Brown asserts that the State failed to present sufficient evidence regarding two of the required elements: (1) that L.B.'s ability to resist or consent was substantially impaired; and (2) that Brown knew or had reasonable

cause to believe that L.B.'s ability to resist or consent was substantially impaired. In support of this position, Brown contends that the evidence established that L.B. had the ability to express what she did and did not want and/or like and that the evidence did not show that he knew or had reason to believe that her mental condition was so substantially impaired that she could not resist or consent to their sexual contact.

{¶21} The term "substantially impaired" is not statutorily defined. However, the Ohio Supreme Court, in giving this term its plain and ordinary meaning, has held that

> **substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report.**

*State v. Zeh* (1987), 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414. "'Substantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *State v. Hillock*, 7th Dist. No. 02-538-CA, 2002-Ohio-6897, at ¶ 21, citing *State v. Tate* (Oct. 26, 2000), 8th Dist. No. 77462, 2000 WL 1594426; see also *State v. Dorsey*, 5th Dist. No. 2007-CA-091, 2008-Ohio-2515, at ¶ 43; *State v. Brady*, 8th Dist. No. 87854, 2007-Ohio-1453, at ¶ 78.

{¶22} While the Supreme Court discussed the term "substantial impairment" in *Zeh*, the issue in that case concerned whether the defense could move to bar the State from using evidence of a "mental condition that was obtained in a clinical interview of the witness prior to trial[,]" not what evidence was necessary to find the victim was substantially impaired. *Zeh*, 31 Ohio St.3d at 105. Thus, courts have made this determination on a case-by-case basis, providing great deference to the fact-finder. See e.g. *Dorsey*, supra (finding sufficient evidence of substantial impairment of 80-year-old victim who suffered from dementia, lived independently, but was unable to care for herself without some assistance); *State v. Thomas*, 1ˢᵗ Dist. No. C-060318, 2007-Ohio-1723 (finding sufficient evidence of substantial impairment where victim was mentally handicapped, worked for a company that employed people who were unable to maintain employment in the regular workforce, was unable to live independently, and was unable to find her way home from any point at a significant distance from her residence due to her mental disability); *State v. Shepherd*, 8ᵗʰ Dist. No. 81926, 2003-Ohio-3356 (finding sufficient evidence of substantial impairment where 33-year-old victim, who lived alone, had a mental age of five, an IQ of 33 or 34, and had child-like interests such as playing hide and seek, coloring, and watching cartoons).

{¶23} In the case sub judice, L.B.'s father testified that L.B. was thirty-three-years-old at the time of the offense, mentally impaired, and had the mental capabilities of a five to seven-year-old. He further testified that L.B. has never lived on her own, has never gone shopping without assistance, was not capable of doing most things by herself, has no concept of money, and that she has to be reminded to change her clothes or she will wear the same thing for days. He also testified that he had to help her wash her hair, remind her to take a bath, and prepare her meals for her.

{¶24} William further testified that for entertainment, L.B. watches ball games and music shows on television and plays with stuffed animals. She also sleeps with dolls. L.B. never attended regular school but did attend an educational program for children who are mentally disabled. She has never driven a car or had a job. L.B. speaks in one to three word sentences, points if she wants something, and cannot answer the telephone because she cannot carry on a conversation. L.B. had never dated anyone or been married. Additionally, she was given a certain type of birth control to prevent her from menstruating because she was not able to properly care for herself during her menstrual cycle. William never discussed sex with L.B. because he believed she would not understand the subject-matter. Further, William rarely left L.B. home alone, and when he did so, he never left her for more than a couple of hours.

{¶25} Ruth Weinbrom, a psychologist with North Central Ohio Educational Service Center who works with special needs students, also testified on behalf of the State. Weinbrom testified that mental retardation is a sub-average intellectual functioning combined with adaptive behavior deficits in at least two areas. Adaptive behavior, according to Weinbrom, refers to the skills and abilities that an individual must have to meet the social and cultural expectations for independent living. In short, mental retardation describes an individual's ability to process information and includes one's cognitive ability to make choices. IQ tests are used to measure a person's cognitive ability, i.e. intellectual skills. These tests are structured for a majority of the population, scores are usually reported in a range, and the tests are designed so that the results remain relatively the same throughout a person's life span whether the person is ten or fifty-years-old.

{¶26} She also testified that the range of a normal IQ is 85 to 115. An IQ range of 70-75 or below is defined as mental retardation. There are also levels of mental retardation, with a range of 50 or 55 to 75 being *mild* mental retardation, 35 or 40 to 50 being *moderate* mental retardation, 24 to 35 being *severe* mental retardation, and below 20 being *profound* mental retardation. Of all mentally retarded individuals, approximately 85% have mild mental retardation, approximately 10% have moderate mental retardation, approximately 3-4% have severe mental retardation, and 1-2% have profound mental retardation.

{¶27} Weinbrom further testified that someone who is moderately mentally retarded has difficulty learning, has difficulty with reasoning skills and problem solving, his/her communication skills develop much later, academic skills typically reach a second grade level, and he/she would need supervision for daily living but may be able to have a job under supervision. In addition, a moderately retarded adult would have a mental age range of five to eight-years old. A severely mentally retarded individual has less language development and less of an ability to take in information, to reason, and to problem solve. Such a person would need repetitive teaching to learn basic life skills, would achieve a kindergarten or first-grade level academically, and would need much more intensive support for daily living and a sheltered workshop setting for employment. Weinbrom also testified that a severely retarded adult would have a mental age range of three to five-years-old.

{¶28} When L.B. was sixteen-years-old, Weinbrom conducted a psycho-educational evaluation on her. This evaluation contained two IQ tests performed on L.B. when she was nine-years-old and when she was twelve-years-old. At age nine, L.B.'s cognitive, social, visual-fine motor, receptive language and social-emotional development age was approximately that of a four-year-old. At twelve-years-old, her IQ test results indicated that she was within the moderate to severe range of mental retardation, with an IQ score in the range of 35. Weinbrom's

evaluation of L.B.'s IQ at age sixteen also placed L.B. in the moderate to severe range of mental retardation, with an overall IQ score of 36. In addition, L.B.'s adaptive behavior evaluation yielded an overall score of 25, placing her in the severe or profound range of mental retardation. Based on Weinbrom's assessment of L.B., she fell in the lower 15% of all mentally retarded individuals.

{¶29} John Holsinger, the activities director at Sterling House, also testified. He met L.B. when her mother moved into the facility. He testified that L.B. helped him with simple jobs, such as placing bingo cards on the tables for residents, but that L.B. was not able to help residents find numbers on their cards. He also stated that she looks like she is mentally challenged. Holsinger interacted with L.B. frequently but she was unable to have an adult conversation with him. Instead, she would provide two to four word responses to questions and comments made by him to her. Further, he testified that L.B. is friendly, giving hugs to everyone, and that he never observed her treat Brown differently from anyone else.

{¶30} Deputy Miller, the first one to respond to L.B.'s home, testified that he attempted to speak with L.B., however, she would not talk with him. Although she eventually told him that she was "o.k.," he testified that it was apparent to him upon looking at her that she was mentally challenged.

**{¶31}** In addition, Lt. Cline testified that Brown, himself, made a statement in the garage that L.B. spoke in one word answers and pointed and that her mental age was around that of a seven or eight-year-old. Furthermore, in his recorded statement to the officers, Brown stated that L.B. did not speak that much and that he would tease her by looking at pictures of animals in a book and misidentifying them so that she would correct him. For instance, Brown would point to a picture of a horse and say, "Horse," and would point to it again and say, "Cow," and L.B. would correct him by saying, "No, horse." He would also tease her by asking, "Where's my candy," whenever she would be looking through her purse and showing him what she had in her purse. When he was working at the Sterling House, Brown would allow L.B. to turn the lights off in various rooms because "she got a kick out of it."

**{¶32}** Throughout this interview, Brown repeatedly stated that the incident was his fault and that he should not have been out there, he should not have let her do what she did, he should have known better, and he did not "even know if she really even knew what she was doing." He also stated that he was sixty-five-years old, recently divorced after thirty-eight years of marriage, had six children of his own, and that he did not blame William for being upset because he would be upset if she was his daughter.

{¶33} Moreover, Laura Kaiser, the SANE nurse who examined L.B., testified that it was apparent that L.B. was not a normally functioning individual. Because of L.B.'s obvious limitations, Nurse Kaiser, who had performed 97 adult SANE exams and 47 pediatric SANE exams at the time of trial, decided to try to determine L.B.'s level of functioning in order to best communicate with her and make her feel comfortable with the examination. In so doing, she noted that L.B. spoke "baby talk," i.e. broken sentences such as, "I want bear." She asked L.B. to identify numbers and to recite the alphabet, but L.B. was incapable of doing either. Nurse Kaiser then decided to try a more rudimentary task and have L.B. color in order to determine whether L.B. could accurately identify colors. L.B. was able to do so. She was also able to properly identify various body parts, but did so through the use of a purple teddy bear she had brought to the hospital with her.

{¶34} When Nurse Kaiser began asking L.B. why she was there, L.B. stated, "I want my daddy." The nurse then asked if there was any part on her body that hurt, and L.B. again stated, "I want my daddy." Nurse Kaiser then decided to rely on the teddy bear because L.B. seemed more comfortable communicating through the bear. She asked the teddy bear if it hurt anywhere, and L.B. stated, "He touched pee-pee" and pointed to the bear. L.B. then stated, "He touched my pee-pee," and pointed to her vagina. When asked, "Who," L.B. responded, "Bill," and further stated, "He put pee-pee in pee-pee," and pointed to her vagina again.

Through this conversation, Nurse Kaiser determined that L.B. appeared to be functioning similarly to a three or four-year-old and chose to examine L.B. as if she were performing a pediatric examination.

{¶35} The State also introduced three photographs of L.B. from the neck up, which were taken by Nurse Kaiser on the day of her examination. In one of the photographs, L.B. is holding the purple teddy bear she brought with her to the hospital.

{¶36} After the State presented its case, Brown testified on his own behalf. In his testimony, Brown stated that he did not consider L.B. to be a child but "considered her as a slow person." Brown denied ever believing her mental abilities were that of a seven or eight-year-old. He also testified that he thought everyone treated her as a child but he felt that "they should give her that chance to be her own self." Brown further stated that when he and L.B. were touching one another that he believed she knew what she was doing.

{¶37} During cross-examination, Brown testified that the only reason he told Lt. Cline in his recorded interview that L.B. did not know what she was doing was to protect her reputation. He also acknowledged that if a seven or eight-year-old child would have touched his penis, he would not have engaged in sexual activity with the child and would have explained to the child that such actions were improper.

{¶38} Despite Brown's testimony, when construing the evidence in a light most favorable to the prosecution, the record amply demonstrates L.B.'s mental deficiency. Her interests and abilities, such as coloring and placing bingo cards, were those of a young child. Although her physical age and anatomy were that of an adult, nothing about her lifestyle indicated that she had the mental maturity of an adult. Everyone who knew L.B. and testified on behalf of the State, testified that L.B.'s mental deficiency was obvious. Even those who had only met her for the first time on the day of incident quickly realized, either from her appearance or within a few moments of speaking with her, that she was mentally impaired. In fact, Nurse Kaiser found her abilities so impaired, that she decided that a pediatric SANE examination was necessary for her thirty-three-year-old patient.

{¶39} Moreover, Brown's own statements evidenced his knowledge of her significant limitations. Brown was sixty-five and had raised six children of his own. Nothing in his recorded interview evidenced that he had any mental limitations of his own or was otherwise incapable of discerning L.B.'s mental capabilities. Further, the jury was able to personally witness Brown testify and determine his ability to understand and comprehend matters. Although disputed by Brown in his testimony, he stated to Lt. Cline that he believed that her mental functioning was that of a seven or eight-year-old. In addition, Brown's depictions of the types of conversations in which L.B. engaged with him illustrated that these

conversations were rudimentary and typical of communications one might have with a very young child. The others who testified about her communication level had these same types of basic communications with her.

{¶40} Thus, after viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that L.B.'s ability to consent or resist was substantially impaired due to her mental condition and that Brown knew or had reasonable cause to believe that L.B.'s ability to resist or consent was substantially impaired. Accordingly, the first assignment of error is overruled.

{¶41} As for the burglary conviction at issue in the third assignment of error, the State had to show that Brown, by force, stealth, or deception trespassed in an occupied structure when another person other than an accomplice of Brown's was present with purpose to commit in the structure any criminal offense. See R.C. 2911.12(A)(1). Here, Brown contends that the State failed to show two of the required elements: (1) the underlying criminal offense, i.e. gross sexual imposition; and (2) that he trespassed.

{¶42} The Ohio Supreme Court has held that a person who lawfully enters another's premises becomes a trespasser subject to conviction for burglary by virtue of the commission of a felony on the premises. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 509 N.E.2d 383. Accordingly, although Brown may have

been invited into the home by L.B., the privilege to lawfully be in the home was revoked by virtue of the commission of any one of the gross sexual imposition offenses. Having previously found that the State presented sufficient evidence on the gross sexual imposition charges, we find Brown's third assignment of error challenging the sufficiency of the evidence on the burglary count to be without merit. Therefore, the third assignment of error is overruled.

*Second Assignment of Error*

{¶43} In Brown's second assignment of error, he maintains that the trial court erred in failing to merge all three counts of gross sexual imposition. More specifically, he asserts that these three offenses were part of one course of conduct without any break in the temporal continuum between them.

{¶44} Ohio's multiple-count statute states:

**(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

R.C. 2941.25. In order to determine whether the trial court should have merged these offenses, we must apply the two-step analysis established by the Ohio

Supreme Court. See *State v. Jones*, 78 Ohio St.3d 12, 13, 676 N.E.2d 80, 1997-Ohio-38, citing *State v. Blankenship* (1988), 38 Ohio St.3d 116, 526 N.E.2d 816. First, a comparison of the elements of the crimes is necessary. "If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step." *Blankenship*, 38 Ohio St.3d at 117. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. "If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses." *Id*.

{¶45} The Ohio Supreme Court has held that crimes involving distinct sexual activity, i.e., vaginal intercourse, cunnilingus, and digital penetration, each constituted a separate crime with a separate animus, and they do not constitute allied offenses of similar import. *State v. Nicholas* (1993), 66 Ohio St.3d 431, 435, 613 N.E.2d 225. This Court has previously followed the rationale of *Nicholas*, and applied it to the offense of gross sexual imposition. See *State v. Austin*, 138 Ohio App.3d 547, 549-550, 741 N.E.2d 927, 2000-Ohio-1728.

{¶46} In *Austin*, the defendant was found guilty of two counts of gross sexual imposition, one in which the defendant touched the victim's breast with his hand and one in which he kissed the victim's breast with his mouth. *Id*. at 550.

This Court found that the record did not demonstrate that these acts occurred "in a single, simultaneous instance; rather [these] acts occurred separately but in close proximity of time during the same extended assault of the victim." *Id.* Thus, we concluded that "these acts were of sufficiently separate character * * * so as to constitute separate crimes that do not constitute allied offenses of similar import. Therefore, the trial court acted properly in not treating these offenses as allied offenses of similar import and sentencing defendant for both." *Id.*

{¶47} This case is similar to *Austin*. Here, Brown's act of unzipping his pants and exposing his penis to have L.B. touch it, his act of touching L.B.'s breast, and his subsequent act of touching her vagina with his penis after he ejaculated did not occur in a single, simultaneous instance. Rather, these acts occurred separately but in close proximity of time during the same assault. As such, they were of sufficiently separate character so as to constitute separate crimes that do not constitute allied offenses of similar import. Therefore, as was the case in *Austin*, the trial court did not err in refusing to merge these three offenses, and the third assignment of error is overruled.

{¶48} For these reasons, the judgment of the Common Pleas Court of Marion County, Ohio, is affirmed.

***Judgment Affirmed***

**PRESTON, P.J., and ROGERS, J., concur.**