[Cite as *State v. Lasenby*, 2014-Ohio-1878.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 1-13-36

      v.

WILLIE L. LASENBY,                  O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR20130021

Judgment Affirmed

Date of Decision: May 5, 2014

APPEARANCES:

    *Michael J. Short* for Appellant

    *Jana E. Emerick* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Willie L. Lasenby, appeals the judgment of the Court of Common Pleas of Allen County, convicting him of one count of rape and sentencing him to a prison term of eight years. On appeal, Lasenby argues that the trial court erred by entering a guilty verdict that was against the manifest weight of the evidence. Lasenby also claims that he was denied the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On March 14, 2013, Lasenby was indicted by the Allen County Grand Jury on one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree, and one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree. Count two included an additional firearm specification under R.C. 2941.145(A).

{¶3} The matter proceeded to a jury trial commencing on May 28, 2013. During voir dire, the court asked whether the jury could keep an open mind about the case and whether everyone would be able to follow the law as instructed by the court. The State asked whether any of the jurors knew any witness, including Rhonda Norris. Several jurors raised their hands and explained how they knew some of the State's witnesses. The State and Lasenby's trial counsel ("Counsel") asked several questions regarding whether jurors could listen to the testimony and be fair. Further, when a juror was excused for cause or through a peremptory

challenge, the new juror was asked whether they had heard all of the prior questions and whether they had any information they should share with the court in response. Counsel objected to questions by the State regarding the difference between sex and rape and the need for DNA evidence. (Docket No. 104, p. 53, 152). He also requested that three separate jurors be removed for cause. (*Id.* at p. 75, 88, 149). Additionally, Counsel exercised three peremptory challenges, while waiving the fourth.

{¶4} Juror 4 was seated as part of the prospective jury after a peremptory challenge excused the previous prospective juror in that position. The State inquired whether any prior question "sparked a thought" to which she responded "No. Nothing that would keep me in [sic] judging this case." (Docket No. 102, p. 2). After additional questions, the following exchange with the State took place:

> Q: * * * I discussed a lot about someone who's a victim of a sexual assault and how difficult that may be for them to, you know, talk to everyone, a whole room full of strangers. How do you think you're going to be able to tell if they're telling the truth?
>
> A: I am a registered nurse and I have had patients come in from the ER for that reason. And it's very difficult for them. And a lot of them go through different kind [sic] of, you know, emotional breakdowns, denial, a lot of things. But it's different with every person I would say.
>
> Q: Okay, do you think that would bias you in any way for or against the State?
>
> A: No.

(*Id.* at p. 3). The State, when it finished questioning Juror 4, did not request that she be removed for cause.

{¶5} Following the State's questioning of Juror 4, the following exchange took place with Counsel:

Q: * * * Did you say you help perform rape sex kits?

A: I have before, yes.

Q: Okay. Will that influence you in any way - -

A: No.

Q: - - in this case?

A: No.

* * *

Q: Are you a person that could hold your own?

A: Yes.

Q: Eleven (11) to one (1)?

A: Oh, yeah.

Q: Do you think you could be fair?

A: Yes.

Q: Do you think you could wait until all the evidence was presented?

A: Yes.

* * *

Q: Are you influenced by sympathy?

A: No, I'm not.

(*Id.* at p. 4-6). After Counsel finished questioning Juror 4, he did not request that she be removed for cause, nor was she removed through a peremptory challenge.

{¶6} After voir dire and opening statements, the State proceeded with its case in chief. The first witness was a friend of the victim. She testified that on November 22, 2012, she had eaten Thanksgiving Dinner at her grandmother's house and had invited the victim, S.T., to join them. Around 10:00 that night, S.T. left with three men in a white car with tinted windows. The friend testified that she had never seen S.T. drink alcohol, and that S.T. had not been drinking that night before she left.

{¶7} S.T. was called as the next witness. She testified that during the day she had been in contact through text messages with Lasenby, who is also known as J.R. While she stated that she did not know him well before that day, they had made plans to drink together that night. She testified that she had limited experience with alcohol, "nothing major," and only with family, not with friends. (Docket No. 97, p. 58). Before that night she had never been intoxicated or tipsy, and she had not ingested any alcohol before leaving her friend's house.

{¶8} After getting in the car with Lasenby, "Larry, and some other dude," they proceeded to Larry's apartment where they began drinking alcohol together.

(*Id.* at p. 60-61). She testified that at the apartment, she had four or five shots of alcohol, and then drank the rest straight from the bottle. S.T. testified that, while at the apartment, she did not feel the effects of alcohol and could speak clearly when she left with Lasenby, Larry, and the unidentified male. The four of them drove to a gas station. S.T. stated that while Lasenby was inside the gas station, she "was talking to [her friend] on the phone. And [Lasenby's] friend – the same dude I said I didn't know his name, he was talk – he got to talking to her. And he asked me was I cool, did I need to throw up or anything. I told him, no, I was good." (*Id.* at p. 64). S.T. did not see her phone again until the next morning.

{¶9} The four then went to a second gas station, where Lasenby purchased more alcohol before they returned to Larry's apartment. She testified that at that point, she was no longer talking like herself and that she was "drowsy. Like my head was like, you know, drifting a little bit." (*Id.* at p. 65). At some point she fell down, although she testified it was because she "probably lost [her] balance." (*Id.* at p. 67). She argued with Lasenby after he tried to touch her inappropriately. As a result, the other two asked her to leave the apartment for being too loud.

{¶10} She testified that after she was asked to leave the apartment "[t]hey was trying to leave me. And then – but I ended up getting in the car any which way, so… And everybody was – seemed to be mad so they was all yelling and stuff and I was apologizing. I don't know what for. And then – then [Lasenby]

was telling the dude to drop me over at his Dad [sic] house and stuff." (*Id.*). S.T. testified that she had trouble remembering the events of the evening. At some point in the car ride, Lasenby gave her more to drink by putting a glass of alcohol to her lips. The next thing S.T. remembers is vomiting in a bag that Lasenby had given her. This occurred in the bathroom of Lasenby's father's residence ("Lasenby's residence"). After that, she remembers being upstairs in the bedroom, on a bed, naked except for her bra, but could not remember how she got there or how her clothes were removed. Lasenby was lying on top of her. She told him to stop and she "was trying to push him off but like my hands was [sic] so weak, so…" (*Id.* at p. 72). She testified that he threatened her, she stopped resisting, and she felt his penis enter her vagina. Afterwards, she fell asleep.

{¶11} When S.T. awoke the next morning, Lasenby told her that her sister had called and that the police were looking for her. He gave her back her clothes and her phone, but not her underwear, and showed her how to get home, as she did not know where she was. She went to a neighbor's house, who helped clean the vomit off of her clothes and called her friend. Her family came to help her and she went to the hospital, where she was examined by a nurse and then interviewed by police.

{¶12} On cross examination, the following exchange took place:

Q: Is it hard for you to talk cause [sic] your mother's in the courtroom?

A:   No, my mom's not in the courtroom.

Q:   Oh, she's not here?  Okay.

A:   No.

* * *

Q:   Were you afraid of your mother?

A:   Yes.

Q:   Did you tell Mr. Lasenby you didn't know what you were going to tell your mother - -

Q:   No.

Q:   - - when you left the house?

A:   No.

(*Id.* at p. 87, 95).  Counsel also asked why she never went home that night, to which S.T. responded "How am I supposed to go home when I'm drunk?  I don't even know what apartment we was [sic] at."  (*Id.* at p. 92).

{¶13} On redirect examination, the following exchange took place between the State and S.T.:

Q:   Are you making up this rape - -

A:   No.

Q:   -- Just to avoid your mom being mad at you?

A:   No.

Q: Are you making up this rape for attention?

A: No.

Q: What has this experience been like?

A: What have it's [sic] been like? Rough. Emotional. Long.

(*Id.* at p. 97-98).

{¶14} Next, S.T.'s sister was called as a witness and testified that when she saw S.T. the next morning, she was stumbling a little bit and appeared to still be intoxicated.

{¶15} Rhonda Norris, a Sexual Assault Nurse Examiner ("SANE") at St. Rita's Medical Center, was next to testify. She explained that a SANE nurse is trained to speak with and treat patients who are victims of sexual assault and that they use kits that take "DNA samples [and] hair samples" and they are also trained to do "pelvic exams, vaginal exams, rectal exams looking for any kind of injury." (Docket No. 98, p. 123). Norris testified that she examined S.T. following her specialized training protocols. She also repeated what S.T. told her about the rape. Norris stated that S.T. had trouble remembering what had happened that night, but did remember vomiting and being raped. Norris conducted a rape kit on S.T. but no DNA was found.

{¶16} Detective Robert Stoodt of the Lima Police Department testified that he interviewed S.T. at the hospital. He stated that she described the rape and

"[s]he was detailed with what she could remember." (*Id*., p. 138). She told him that she did not have her underwear and then described the ones she had been wearing the night before. While S.T. could not remember the address of the home where the incident occurred, she was able to point it out, enabling the police to obtain a search warrant. He testified that as a result of the search warrant, they obtained the bag containing S.T.'s vomit, which also contained her underwear. Outside the house, he found vomit on the sidewalk near the front entrance.

{¶17} Next to testify was Detective Steven Stechshulte of the Lima Police Department. He stated that S.T. was able to identify Lasenby through a photo lineup. Before obtaining a search warrant, Detective Stechshulte made contact with Lasenby by phone. At that time, Lasenby said that he had dropped S.T. off at a house on McDonel Street and had not seen her since. Detective Stechshulte participated in the execution of the search warrant, where he stepped in a large amount of vomit found outside the house. He also testified that S.T.'s description of the house was very accurate.

{¶18} After Lasenby was taken into custody on an unrelated matter, he was interviewed by Detective Stechshulte at the Lima Police Department. Detective Stechshulte testified that during the interview, Lasenby admitted that he and two other men picked S.T. up in a white car. They went to two gas stations and then went to Lasenby's residence. Detective Stechshulte reminded him that he

originally stated that he had dropped her off on McDonel street, and Lasenby replied that he did drop her off, but went back to get her.

{¶19} He then told Detective Stechshulte that after they arrived at Lasenby's residence, S.T. was vomiting " 'all over the place. I had to clean her up a couple times.' " (*Id.*, p. 167). Lasenby then told him that " 'she had puke all over her clothes so I took her clothes from her, told her I was going to wash them, but I just threw them out in the hall.' " (*Id.* at p 168). When asked whether he had sex with S.T., Lasenby stated that he had put his fingers inside of her vagina, but that he did not have sex with her. Lasenby also stated that after he put his fingers inside of her vagina, S.T. told him she was a virgin. Detective Stechshulte stated that the interview was recorded and then identified a copy of that recording, which was played for the jury. The recorded interview was similar to what was described by Detective Stechshulte. On the recording, Lasenby was asked whether he knew that S.T. was intoxicated, which he responded that he did.

{¶20} After Detective Stechshulte's testimony, the trial court received all of the State's exhibits into evidence. After the State rested, Counsel asked to voir dire Juror 4 a second time. He was concerned that, as she had the same training as Rhonda Norris, she would give her testimony too much weight. The State objected, stating that Juror 4 had already been voir dired and had explained that

she was a nurse and had performed rape kits before. The court denied Counsel's request, stating that

> she was adequately voir dired by counsel and unequivocally she did
> have training in this area. And frankly it was my opinion that there
> was strategy involved in even - - either keeping her or excusing her
> at the time. And to allow that to be revisited I think would be
> inappropriate under the circumstances.

(*Id.* at p. 190). The defense then rested as Lasenby did not present any witnesses or evidence. Both the State and Lasenby provided closing arguments and the trial court charged the jury before deliberations.

{¶21} On May 29, 2013, the jury found Lasenby guilty of the first count of the indictment but not guilty on the second count and the firearm specification. The trial court accepted the jury's verdict and ordered a pre-sentence investigation report. The matter proceeded to sentencing on July 2, 2013, where the trial court sentenced Lasenby to eight years in prison, five years of post-release control, and classified him as a Tier III sex offender.

{¶22} Lasenby timely filed this appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

***Assignment of Error No. II***

**THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. I*

**{¶23}** In his first assignment of error, Lasenby argues that his conviction was against the manifest weight of the evidence. Specifically, Lasenby argues that the weight of the evidence is against whether S.T.'s ability to resist or consent was substantially impaired. We disagree.

*Standard of Review*

**{¶24}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

**{¶25}** A verdict is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony. *State v. Reed*, 3d Dist. Wyandot No. 16-13-11, 2014-Ohio-644, ¶ 51. Witness credibility is primarily an issue for the trier of fact and we will not substitute our judgment unless it is patently clear that the fact finder lost its way. *Id.*; *State v. Payne*, 3d Dist. Hancock No. 5–04–21, 2004–Ohio–6487, ¶ 15; *see also State v. Parks*, 3d Dist. Van Wert No. 15–03–16, 2004–Ohio–4023, ¶ 13. "Accordingly, this court must afford the decision of the trier of fact the appropriate deference when considering such credibility issues." *Reed* at ¶ 51.

*R.C. 2907.02(A)(1)(c)*

**{¶26}** Rape is defined as sexual conduct with another who is not the offender's spouse, where:

> [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of mental or physical condition * * *.

R.C. 2907.02(A)(1)(c). Sexual conduct includes "the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A). Here, there is no dispute that Lasenby has never been married to S.T. or that he inserted his fingers into S.T.'s vagina, which constituted sexual conduct.

Instead, Lasenby only disputes that S.T. was substantially impaired by a mental or physical condition.

{¶27} While there is no statutory definition, the Ohio Supreme Court has found that "substantial impairment" is "established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987); *State v. Brown*, 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428, ¶ 21. Whether a person is substantially impaired "does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim, and by allowing the trier of fact to do its own assessment of the person's ability to appraise or control his or her conduct." *State v. Brady*, 8th Dist. Cuyahoga No. 87854, 2007-Ohio-1453, ¶ 78; *Brown* at ¶ 21. The determination of substantial impairment is made "on a case-by-case basis, providing great deference to the fact-finder." *Brown* at ¶ 22.

{¶28} Voluntary intoxication constitutes a "mental or physical condition" that can cause substantial impairment under R.C. 2907.02(A)(1)(c). *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 14. The consumption of large amounts of alcohol in a short period of time is evidence that voluntary intoxication caused substantial impairment. *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 22 (2d Dist.); *see also State v. Lindsay*; 3d Dist. Logan No.

8-06-24, 2007-Ohio-4490, ¶ 20. Evidence of substantial impairment can also come from a victim's inability to remember the events of the incident due to alcohol consumption. *Harmath* at ¶ 19. "[S]tumbling, falling, slurred speech, passing out, [and] vomiting," are all evidence that an intoxicated person is substantially impaired. *Hatten* at ¶ 24; *see also State v. Freeman*, 8th Dist. Cuyahoga No. 95511, 2011-Ohio-2663, ¶ 19; *Harmath* at ¶ 18.

*Recapitulation of Evidence*

{¶29} S.T. testified that she had multiple shots in a short amount of time and also drank directly from the bottle. She remembers falling down, but believed that it was because she lost her balance. When she left Larry's apartment the first time, she could still speak clearly. However, S.T. had not had any alcohol to drink before going out that night, and did not have much experience with alcohol in general and had never before been drunk. Further, when she returned to Larry's apartment after going to the gas stations, she stated that she was not talking like herself and her head felt drowsy. Upon leaving the apartment the second time, she remembers apologizing to everyone in the car but could not remember why. She had difficulty remembering exactly what happened that night. At some point in the car ride to Lasenby's residence, he made her drink more alcohol by putting a glass up to her lips. At Lasenby's residence, she vomited multiple times. From that point she remembers nothing until the incident itself. During the incident, she

could not physically resist because her hands were "so weak." Taken together, her testimony is sufficient for a jury to conclude that her level of intoxication had resulted in substantial impairment.

{¶30} At trial, Lasenby offered no evidence to refute whether S.T.'s level of intoxication that night left her substantially impaired. On appeal, he argues that she was not a credible witness and was accusing him of rape to avoid the wrath of her strict mother. However, S.T. stated that she was not afraid to testify because her mother was not in the courtroom. While S.T. admitted that she was afraid of her mother, she also testified that she did not invent the rape to avoid punishment. We find nothing in the record that would preclude the jury from considering her testimony or finding her credible.

{¶31} Even without S.T.'s testimony, there is still evidence of her substantial impairment. S.T.'s friend testified that S.T. was not drunk when she left the friend's house with Lasenby on the night of the incident. This, coupled with S.T.'s sister's testimony that S.T. appeared intoxicated the next morning is evidence that S.T. drank heavily with Lasenby in the time between when she left her friend's house and when she went to the hospital. S.T.'s vomit was found outside Lasenby's residence and inside a bag found in the home, which further demonstrates that she was highly intoxicated when she arrived. Both Norris and Detective Stoodt testified that when they talked to S.T. she had trouble

remembering the events of the previous night. Further, Lasenby himself, in his recorded interview, stated that he knew she was drunk.[1] All of this is evidence the jury could rely on as proof that S.T. was intoxicated to the point of being substantially impaired.

{¶32} Lasenby argues that while S.T. had consumed several shots, she did not feel drunk, still spoke clearly and refused his advances earlier in the evening, evidence that the alcohol did not substantially impair her ability to resist. However, Lasenby gave her more to drink in the car ride to his residence.

{¶33} Lasenby also argues that the act of vomiting does not necessarily prove someone is so intoxicated that they are substantially impaired. However, he cites no case law to support this conclusion. Indeed, other courts have found that the consumption of alcohol coupled with vomiting is proof of substantial impairment due to voluntary intoxication. *See State v. Blazer*, 8th Dist. Cuyahoga No. 93980, 2010-Ohio-6367, ¶ 40 (finding sufficient evidence of substantial impairment based upon consuming alcohol and vomiting); *State v Martin*, 12th Dist. Brown No. CA99-09-026, 2000 WL 1145465, *6 (Aug. 14, 2000) (finding victim substantially impaired when she vomited after consuming large amounts of alcohol). The police testified as to the large quantities of vomit found at the

---

[1] We note that Lasenby does not argue that he did not know that S.T.'s intoxicated state substantially impaired her ability to either resist or consent, which is an element of the crime. *Harmath* at ¶ 21. However, the evidence of S.T.'s impaired state, especially the vomiting, was witnessed by Lasenby, and he specifically stated in his recorded interview that he knew she was intoxicated, satisfying this requirement.

house, both in the bag and on the ground outside. Lasenby, in his recorded interview, stated that he witnessed her vomit all over her clothes and helped clean it off of her, all after witnessing her drink large amounts of alcohol. Thus, while the act of vomiting may not always mean a person is substantially impaired, it was evidence the jury could consider under the facts of this case.

**{¶34}** Finally, Lasenby argues that S.T. was not substantially impaired because she was able to tell him that she was a virgin when he placed his fingers inside her vagina. It appears that Lasenby is arguing that the mere fact that she could say that she was a virgin proves she was not substantially impaired. However, there is ample evidence on the record that S.T. was heavily intoxicated but could still speak. Further, the statute is concerned with the victim's *ability* to consent or resist. *See Blazer*, 2010-Ohio-6367, ¶ 39. The State was only required to show that S.T.'s "*ability* to resist or consent was impaired and the defendant knew or had reasonable cause to believe that her *ability* to resist or consent was substantially impaired." (Emphasis sic.) *Id.* Her statements are otherwise irrelevant as to whether S.T. was substantially impaired. *See id.* at ¶ 41 (finding that statements made by the victim that she wanted to have sex with the defendant were irrelevant, as victim could not consent due to substantial impairment). Therefore, the statement alone does nothing to disprove that she was so intoxicated that she was substantially impaired.

{¶35} In light of all of the evidence, after our review of the record, we find that the manifest weight of the evidence supports a finding that S.T. was substantially impaired due to voluntary intoxication. Therefore, the finder of fact did not lose its way when it found Lasenby guilty of rape.

{¶36} Accordingly, we overrule Lasenby's first assignment of error.

*Assignment of Error No. II*

{¶37} In his second assignment of error, Lasenby argues that he was denied effective assistance of counsel when his attorney failed to adequately voir dire Juror 4. We disagree.

{¶38} Before addressing the merits of Lasenby's second assignment of error, we must address the failure of Lasenby's brief to comply with the Rules of Appellate Procedure. An appellate brief must contain, for each assignment of error, an "*argument* containing the contentions of the appellant with respect to each assignment of error presented for review and the *reasons* in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." (Emphasis added.) App.R. 16(A)(7). Here, Lasenby's brief contains the law governing a claim of ineffective assistance of counsel and the facts of what occurred at the trial. However, there is no application of the law

to the facts, no argument, and no reasons for why counsel was ineffective.[2] Although App.R. 12(A)(2) gives us the authority to disregard this assignment of error, in the interests of justice we elect to address the merits of Lasenby's second assignment of error. *State v. Dunlap*, 3d Dist. Auglaize Nos. 12-13-15, 2-13-16, 2013-Ohio-5083, ¶ 12.

**{¶39}** An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Id.* at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), *superseded by constitutional amendment on other grounds as recognized by State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

**{¶40}** Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Barnett*, 3d

---

[2] After reciting the law and the facts, Lasenby's appellate counsel's "argument" states, in its entirety: "On voir dire counsel should have explored with this juror what, if any, impact the testimony of a witness with the same training would have on her. His failure to make this inquiry [.]" We find it ironic that appellate counsel would abruptly end his analysis in the middle of a sentence while arguing why Lasenby was denied effective assistance of trial counsel.

Dist. Logan No. 8-12-09, 2013-Ohio-2496, ¶ 45. " 'Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.' " *State v. Malone,* 2d Dist. Montgomery No. 10564, 1989 WL 150798, *4 (Dec. 13, 1989) quoting *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661 (1986).

{¶41} The questioning of jurors during voir dire must be thorough and meaningful to afford a defendant an impartial jury. *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 57; *State v. Adams*, 103 Ohio St. 3d 508, 2004-Ohio-5845, ¶ 66. However, the jury selection process is inherently subjective, based upon intangible factors and the experience and intuition of trial counsel. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 64. No specific questions need to be asked, no particular form is mandated, and questions or topics already covered by the trial judge or opposing counsel need not be repeated. *Adams* at ¶ 61, 66. "Trial counsel, who saw and heard the jurors, [are] in the best position to determine the extent to which prospective jurors should be questioned." *Jackson* at ¶ 138.

{¶42} As this court has previously found, where "jurors demonstrate during voir dire that they are able to remain fair and impartial, no action will lie for ineffective assistance of counsel for not seeking their removal." *State v. Bofia*, 3d Dist. Henry No. 07-03-12, 2004-Ohio-3018, ¶ 14. "When a defendant bases an

ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.' " (Emphasis sic.) *Mundt* at ¶ 67, quoting *Miller v. Francis*, 269 F. 3d 609, 616 (6th Cir.2001).

**{¶43}** In the case sub judice, Counsel actively participated in voir dire, asking questions, objecting to questions by the State, requesting the removal of jurors for cause and exercising peremptory challenges. As a result, we find that voir dire of the prospective jurors was thorough and meaningful.

**{¶44}** Further, Juror 4 heard all of the questions asked by the State and by Counsel. She did not indicate that she knew the witness in question. She was forthcoming that she was a nurse and that she had performed rape kits. She also specifically stated that this would not bias her in any way against the defendant or for the State. When asked by Counsel whether she would wait to hear all of the evidence before making up her mind, she said that she would, and she also stated that she could stand up for herself in the jury room. Based on our review of the record, we cannot find any indication that Juror 4 was biased in any way against Lasenby, or that any additional inquiry would have revealed a bias. That Counsel asked for the opportunity to voir dire Juror 4 a second time is irrelevant to whether he adequately participated in the jury selection process.[3]

---

[3] While there is no evidence of bias on the record to indicate that Juror 4 would have been excused for cause, Counsel may have attempted to exercise his unused peremptory challenge had he been granted the

{¶45} In light of Counsel's active participation throughout the jury selection process coupled with the lack of evidence that Juror 4 was biased against Lasenby, we cannot find that Lasenby's trial counsel was ineffective for his conduct during voir dire.

{¶46} Accordingly, we overrule Lasenby's second assignment of error.

{¶47} Having found no error prejudicial to Lasenby, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**

---

opportunity to voir dire her a second time. However, as the trial court noted, Counsel's decision not to exercise a peremptory challenge during the initial voir dire was a trial tactic. *Accord Bofia* at ¶ 14. "Debatable trial tactics, without more, will not be grounds for an ineffective assistance of counsel claim." *Id*.