**[Cite as *State v. McIntosh*, 2022-Ohio-3771.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1207

    Appellee                              Trial Court No.  CR0202001756

v.

Jerronn McIntosh, Jr.                       **DECISION AND JUDGMENT**

    Appellant                            Decided:  October 21, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Jerronn McIntosh, Jr., appeals

the August 10, 2021 judgment of the Lucas County Court of Common Pleas, convicting

him of two counts of rape and sentencing him to concurrent indefinite sentences of six to nine years' imprisonment. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} Jerronn McIntosh, Jr. was charged with two counts of rape,[1] violations of R.C. 2907.02(A)(1)(c), after his then-16-year-old cousin, T.M., claimed that he performed oral sex on her and then penetrated her vagina with his penis. This provision of the rape statute prohibits a person from engaging in sexual conduct with another when the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition. The state maintained that McIntosh knew or had reason to know that T.M. is developmentally disabled, therefore, her ability to resist or consent was substantially impaired.

{¶ 3} The case was tried to a jury beginning June 21, 2021. T.M. claimed that on the night in question, McIntosh took her to the store, then asked her to come over to his house to babysit his son. While at McIntosh's home, McIntosh asked T.M. to smoke marijuana, and she said yes. At some point thereafter, McIntosh pulled down her pants and put his tongue on her vagina. T.M. described that she couldn't talk, couldn't move, "couldn't do nothing." McIntosh then brought her to his room and inserted his penis into her vagina. He told her to tell him if it hurt. She told him it hurt, then he stopped.

---

[1] McIntosh was initially charged with four counts of rape, but the state dismissed Counts 1 and 2 (alleging violations of R.C. 2907.02(A)(1)(a)) and renumbered Counts 3 and 4 (alleging violations of R.C. 2907.02(A)(1)(c)) as Counts 1 and 2.

2.

McIntosh told her not to tell anyone, and he gave her $60. T.M. called her sister, then called her mother, A.M., to pick her up. McIntosh left before A.M. arrived. When she got in the car, T.M. told A.M. that McIntosh raped her. A.M. took T.M. to the hospital where she was seen by a nurse who specializes in examining victims of sexual assault (a "SANE" nurse).

{¶ 4} A rape kit was performed at the hospital. Vaginal and anal swabs revealed DNA from T.M. and a male, but the quality was not sufficient to identify the second contributor. Pubic combings revealed DNA from T.M. and a male contributor consistent with McIntosh's DNA profile. The occurrence of the DNA profile consistent with McIntosh's DNA was one in 300 billion.

{¶ 5} McIntosh testified in his own defense. He said that he asked T.M. to babysit his son so he could sleep before going in to work the next morning. He smoked "a blunt"—but denied that he offered any to T.M.—then went to sleep. He claimed that he awoke to find T.M. on top of him, grinding on him with her pants and underwear off. He threw her off him and said he was going to tell her mother. He then left to get some air, leaving T.M. at his house with his son.

{¶ 6} McIntosh insisted that he did not have oral or vaginal sex with T.M. He testified that his shorts were on, he was not erect, and his penis was not out. He believes that T.M. is claiming he raped her because she was afraid of getting in trouble with her mom.

3.

{¶ 7} The state offered evidence from multiple witnesses in support of its position that T.M. had a mental or physical condition that substantially impaired her ability to resist or consent to sexual conduct. McIntosh attempted to refute this evidence. The following testimony was presented pertinent to (1) whether T.M.'s ability to resist or consent to sexual conduct was substantially impaired because of a mental condition, and (2) whether McIntosh knew or had reasonable cause to believe that T.M.'s ability to resist or consent to sexual conduct was substantially impaired because of a mental condition.

### A. T.M.

{¶ 8} T.M. testified that she babysat McIntosh's son almost every weekend and McIntosh would pay her $20. She also babysits her sister's baby. T.M. is not usually left home alone because there are many people living in her house. She is allowed to go out in the neighborhood with her friends—they go to the park, walk around, and go to each other's houses. Her friends do not pressure her to drink, do drugs, or steal, but she has gotten into trouble at school. She has missed a lot of school because she slept late or did not feel like going. When T.M. gets in trouble at home, her mother takes her phone away and won't let her leave the house. She denied that she fights often with her mother or that she ran away from home a couple of weeks before the incident.

{¶ 9} T.M. testified that she took sex education in seventh or eighth grade, her mother talked to her about sex, and she knows what sex is. She has had a girlfriend before for five months and a boyfriend for six months to a year.

4.

## B. Veronica Casper

{¶ 10} Veronica Casper is a clinical therapist and the CEO of A Step Beyond. T.M. has been treating at A Step Beyond for about two years. She is "delayed," and "functions way below her age." She normally carries a teddy bear and sucks her thumb. Her "[s]ocial skills are impaired," she is "very immature for her age," she has "boundary issues," and she is "easily influenced." T.M. plays with kids much younger than she is and does not understand why a third-grader shouldn't be friends with someone in high school.

{¶ 11} T.M. is on an IEP due to her delays. Her case management is focused on social skills, boundaries, and hygiene. Her therapy is focused on the reasons behind her emotions and trauma. T.M. has flashbacks, anxiety, nightmares, and she cries easily and is fearful of people. She was a patient before this incident, but she was admitted into therapy after she was raped and after she witnessed domestic abuse in her home.

{¶ 12} T.M. will always have cognitive delays. She functions at a level of an eight or nine-year-old. She will never be like someone with an average IQ. Her disabilities prevent her from caring for herself—her hygiene is poor, she has boundary issues, and she cannot budget money. She is unable to think long-term and it is questionable whether she knows right from wrong. T.M. can feed herself. Casper is not sure if T.M. can drive, although she is not aware of any legal bar to her driving. Because she is now 18, Casper would recommend a guardianship for T.M. to help with finances and big decisions.

5.

{¶ 13} Casper conceded that there are many reasons for thumb-sucking. Some people suck their thumb to reduce stress or anxiety or to replace boredom, like nail-biting. Casper has witnessed T.M. suck her thumb in school.

### C.     A.M.

{¶ 14} A.M. testified that T.M. does not function at her age. In 2008, T.M. was qualified as a student with cognitive disabilities. She takes special classes at school and has an IEP. She was reevaluated in 2011 and 2014 and her eligibility continued. A.M. collects social security income due to T.M.'s disabilities.

{¶ 15} There was a time T.M. wasn't going to school much at all and the school contacted A.M. When T.M. skips school, she's at home sleeping. T.M. has been suspended from school for fighting and for using profanity. She had 24 discipline incidents at one school and was suspended six times.

{¶ 16} A.M. conceded that T.M. babysits for her niece and for McIntosh's son. A.M. sometimes leaves T.M. home alone. T.M. can clean herself and make her own food. A.M. has sent T.M. to the store to buy things, but T.M. does not really understand how money works. T.M. is allowed to use social media. She has had boyfriends or girlfriends. She hangs out in the neighborhood with her friends. They have gotten into trouble before. T.M. has rules at home—e.g., clean up after herself, take care of the dog, make sure her work is done, no cussing—and when she does not follow the rules, she loses her phone or is grounded. When T.M. is grounded, she gets angry.

{¶ 17} T.M. told A.M. she had been raped—T.M. knew what "raped" means. A.M. had talked with T.M. about rape before.

{¶ 18} T.M. has known McIntosh her whole life and McIntosh has lived with A.M.'s family a couple of times over the years. A.M. claimed that McIntosh knows of T.M.'s mental disabilities.

### D. Natalie Jones

{¶ 19} Natalie Jones has been a SANE nurse for four years. She examined T.M. on the night in question. Jones described T.M. as tearful and child-like. She was lying in fetal position, wrapped in a blanket, and sucking her thumb. Although Jones admittedly had no baseline for T.M.'s normal behavior, she described T.M.'s speech and mannerisms as child-like, and Jones observed that T.M. did not function like a typical 16-year-old.

{¶ 20} Jones's records indicate that T.M.'s mother reported that T.M. has developmental delays, but that is not something that Jones herself evaluates or diagnoses, so she cannot confirm that that is accurate. Elsewhere in her report, she indicated that T.M. is not disabled, mentally ill, or an elderly adult. Jones later indicated in her report that T.M. has mental health concerns of "depression, other, and anxiety." She specified that T.M. has ADHD. And she later marked in the chart that T.M. has disabilities including anxiety and ADHD. This information would have come from the patient or parent.

7.

## E.    Detective Andre Bills

{¶ 21} Detective Andre Bills interviewed T.M. at the Children's Advocacy Center. She did not cry and was comfortable and talkative with him. T.M. told Bills that McIntosh "ate [her] out" and "stuck it in [her]." He conceded that 16 is the age of consent in Ohio, and it is not illegal to have sex with one's cousin. But his experience with T.M. was that she seemed to function at the level of an eight-year-old and not a 16-year-old.

## F.    Jerronn McIntosh

{¶ 22} At the time of trial, McIntosh was 29 years old. T.M is his cousin. He has a now-five-year-old son who T.M. babysat almost every weekend. McIntosh paid T.M. $20 to watch his son. He said he would not have allowed T.M. to babysit if she wasn't capable of it, and nothing has ever happened when T.M. babysat. He noted that T.M. also babysits her two-year-old niece.

{¶ 23} McIntosh has lived with T.M.'s family off and on. He knows that T.M. gets in trouble at school, but he said that she's good with family and knows right from wrong. McIntosh has never talked to anyone about T.M.'s diagnosis, does not know if she was ever on medications, did not know she was on an IEP, did not know she was in therapy, and was not aware of any interventions to help with her alleged disability.

{¶ 24} McIntosh described T.M. as outgoing and chatty. He acknowledged that she sucks her thumb. She has done it her whole life and he views it not as childlike, but

8.

as a "comfort blanket" for her. He speculated that T.M. may be uncomfortable in different surroundings, but with family she is outgoing and chatty. T.M. told McIntosh that she had run away two weeks before and had been cutting herself. He told her to just worry about school and getting stuff done and she wouldn't have to worry about getting in trouble with her mom.

{¶ 25} McIntosh denied that he had oral or vaginal sex with T.M. He does not know why T.M. is saying this happened. He believes that T.M. accused him of rape because she was afraid of getting in trouble with her mom. He thinks that T.M. did not realize that the accusation would get to this point.

{¶ 26} McIntosh has no formal education about mental conditions, but he does not believe that T.M. has a substantial mental condition. To the extent that the SANE nurse, T.M.'s therapist, his aunt, or the state feel differently, he disagrees with them because he does not see this in T.M.'s everyday life with her family. McIntosh does not disagree with the school that issued T.M.'s IEP because he doesn't know anything about that. He emphasized that he would not want her watching his son if she wasn't capable of doing it. He believed she was capable of babysitting, and so did her mom and her sister who entrusted T.M. with her niece.

{¶ 27} Ultimately, the jury found McIntosh guilty of two counts of rape, violations of R.C. 2907.02(A)(1)(c) and (B), first-degree felonies. The trial court sentenced McIntosh to minimum terms of six years in prison to a maximum term of nine years, to

9.

be served concurrently. A mandatory five-year term of postrelease control was imposed, and McIntosh was found to be a Tier III sex offender.

{¶ 28} McIntosh appealed. He assigns the following two errors for our review:

I. R.C. 2907.02 is void as it fails to define "mental condition."

II. The State failed to prove beyond a reasonable doubt sexual conduct occurred, that the victim suffered any impairment, let alone a substantial impairment and that Appellant was aware of, or any reasonable person would have been aware of, that impairment.

## II.     Law and Analysis

{¶ 29} In his first assignment of error, McIntosh challenges the constitutionality of R.C. 2907.02(A)(1)(c). He argues that because it fails to define "mental condition," it is void for vagueness. In his second assignment of error, McIntosh challenges the sufficiency of the evidence. He claims that the state failed to present evidence that sexual conduct occurred, that T.M. was substantially impaired, or that McIntosh was aware of a substantial impairment.

{¶ 30} We consider each of McIntosh's assignments in turn.

## A.     Void for Vagueness Challenge

{¶ 31} In his first assignment of error, McIntosh argues that R.C. 2907.02(A)(1)(c) is unconstitutionally vague because it does not define "mental condition." He further complains that expert medical testimony is not required to prove that a victim has a

10.

medical or physical condition and that lay people are permitted to testify as to their subjective beliefs concerning whether the victim has a mental or physical condition. McIntosh contends that if the victim never testifies, "the jury can never see for themselves how the victim acts and behaves," and if the victim does testify, "the jury has no way to know if that victim is acting or has been coached on how to appear more 'impaired.'"

{¶ 32} The state responds that a statute is not unconstitutionally vague merely because not every term is defined. It maintains that some terms can be properly understood by their plain, ordinary meaning, and an average person can easily understand and apply "mental condition" as it is used in R.C. 2907.02. The state points out that in *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987), the Ohio Supreme Court "did not declare the Rape statute void based on the Legislature's failure" to define the phrase "substantial impairment." And it argues that if expert testimony is not required to prove "substantial impairment," it should not be required to prove the existence of a "mental condition."

{¶ 33} "Under the Due Process Clauses of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, any statute which fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute is void for vagueness." (Internal citations omitted.") *State v. Tanner*, 15 Ohio St.3d 1, 3, 472 N.E.2d 689 (1984),

11.

quoting *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.E.2d 110 (1972). A statute or regulation must meet three requirements to survive a challenge under the void-for-vagueness doctrine. *Viviano v. Sandusky*, 2013-Ohio-2813, 991 N.E.2d 1263, ¶ 15 (6th Dist.), citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). "It must (1) provide fair warning to the ordinary citizen of what conduct is proscribed, (2) preclude arbitrary, capricious, and discriminatory enforcement, and (3) not impinge upon constitutionally protected rights." *Id.* The crime and its elements must be expressed clearly enough for an ordinary person to choose, in advance, what course he may lawfully pursue. (Citations omitted.) *Tanner* at 6.

{¶ 34} Despite these well-recognized principles, a statute need not avoid all vagueness and is not necessarily void for vagueness merely because it could have been worded more precisely. *State v. Stallings*, 150 Ohio App.3d 5, 2002-Ohio-5942, 778 N.E.2d 1110, ¶ 12 (9th Dist.); *State v. Dorso*, 4 Ohio St.3d 60, 61-62, 446 N.E.2d 449 (1983). In fact, both the Ohio and U.S. Supreme Courts have recognized that "[m]any statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties." (Internal quotations and citations omitted.) *Dorso* at 62, quoting *Rose v. Locke*, 423 U.S. 48, 49–50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). Accordingly, "[a] statute will not be found void for vagueness if any 'reasonable and

12.

practical construction' can be given to its language." (Citations omitted.) *State v. Sommerfield*, 3d Dist. Union No. 14-05-23, 2006-Ohio-1420, ¶ 16.

{¶ 35} Nor is a statute necessarily void for vagueness because it fails to define a term or phrase. To the contrary, "[a] legislative body need not define every word it uses in an enactment." *Dorso* at 62. Undefined terms must simply be accorded their common, everyday meaning. *Id.* This principle is codified in R.C. 1.42, which provides that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶ 36} R.C. 2907.02(A)(1)(c) prohibits a person from "engag[ing] in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *."

{¶ 37} McIntosh correctly points out that the legislature did not define "mental or physical condition," nor has the Ohio Supreme Court prescribed an exact definition. *State v. Horn,* 159 Ohio St.3d 539, 2020-Ohio-960, 152 N.E.3d 241, ¶ 12. The Ohio Supreme Court, however, has interpreted the word "condition," however. "Based on its context in R.C. 2907.02(A)(1)(c)," the Ohio Supreme Court in *Horn* looked to the

13.

dictionary definition of the word and interpreted "condition" to mean "'[a] state resulting from a physical or mental illness,'" *Horn* at ¶ 10, quoting *Shorter Oxford English Dictionary* 483 (6th Ed.2007), or "'a usually defective state of health' or a prerequisite or restricting factor," *id.,* quoting *Merriam-Webster's Collegiate Dictionary* 259 (11th Ed.2020).

{¶ 38} In R.C. 2907.02(A)(1)(c), "mental" merely modifies the word "condition." The dictionary offers several definitions of "mental," including "relating to the mind, its activity, or its products as an object of study"; "occurring or experienced in the mind"; "of, relating to, or affected by a psychiatric disorder." https://www.merriam-webster.com/dictionary/mental (last accessed October 3, 2022).

{¶ 39} Taken together as a phrase, for purposes of R.C. 2907.02(A)(1)(c), "mental condition" can reasonably be interpreted to mean a defective state of health relating to the mind. While the phrase is potentially broad and may encompass numerous conditions ranging from mild cognitive impairments to serious psychiatric disorders, the statute criminalizes the behavior at issue only where the victim's mental condition substantially impairs his or her ability to resist or consent and the defendant knows this or has reasonable cause to believe this. We find that the statute is not unconstitutionally vague merely because it fails to define "mental condition."

{¶ 40} McIntosh complains that if the victim never testifies, "the jury can never see for themselves how the victim acts and behaves," and if the victim does testify, "the

14.

jury has no way to know if that victim is acting or has been coached on how to appear more 'impaired.'" There are many ways the state can prove that the victim has a "mental condition" and that his or her ability to resist or consent is "substantially impaired." In this case, the state offered evidence from the victim's mother, the treating SANE nurse, a mental health professional who has treated the victim, and the victim herself.

{¶ 41} "A fundamental premise of our criminal trial system is that the *jury* is the lie detector." (Internal quotations omitted and emphasis added.) *State v. Sipes*, 5th Dist. Delaware No. 08 CA-A-04-0014, 2008-Ohio-6627, ¶ 37, quoting *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973). "Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" *Id.,* quoting *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891). That a jury is permitted to determine whether a victim has a mental condition does not render the statute void.

{¶ 42} We reject McIntosh's claim that R.C. 2907.02(A)(1)(c) is void for vagueness because it fails to define "mental condition." Accordingly, we find McIntosh's first assignment of error not well-taken.

15.

### B.    Sufficiency of the Evidence

**{¶ 43}** In his second assignment of error, McIntosh argues that the state failed to present sufficient evidence that (1) sexual conduct occurred, (2) T.M. was substantially impaired, and (3) that McIntosh was aware of any impairment.

**{¶ 44}** Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

### 1.    Sexual Conduct

**{¶ 45}** McIntosh first claims that the state failed to present evidence that sexual conduct occurred. He argues that his DNA was found only in T.M.'s pubic hair—not in

or around T.M.'s vagina, where one would expect to find DNA if McIntosh and T.M. engaged in oral or vaginal sex.

{¶ 46} In making this argument, McIntosh ignores T.M.'s testimony. T.M. clearly stated that McIntosh licked her vagina and put his penis in her vagina. This, of course, constitutes "sexual conduct." *See* R.C. 2907.01(A) ("'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another * * *."). The state was not required to corroborate the victim's testimony with DNA or other evidence. *See State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53 ("Corroboration of victim testimony in rape cases is not required.").

### 2. Substantial Impairment

{¶ 47} McIntosh next claims that while the state presented evidence that T.M. is immature, is easily manipulated, is a follower, and is on an IEP, it failed "to prove beyond a reasonable doubt" that these things equated to T.M.'s inability to control her behavior or understand that she was having sex. McIntosh emphasizes that despite describing T.M. as low-functioning, A.M. left T.M. to care for a newborn, allowed her to

17.

babysit a toddler every week, and permitted her to go places with her friends without adult supervision.[2]

{¶ 48} The state responds that the evidence established the victim's impairment. Specifically, it maintains that T.M.'s demeanor at trial was of "great discomfort," she had trouble looking at the prosecutor, and she covered her face at one point. It claims that at age 16, T.M. mentally operated at an eight-year-old level. It emphasizes A.M.'s testimony that she received disability benefits for T.M., school records show T.M.'s cognitive disabilities, T.M. has an IEP, is easily influenced by others, and has poor personal hygiene, and there was testimony that T.M. cannot live independently, cannot handle her own finances, cannot think long-term, and still sucks her thumb at 18 years old.

{¶ 49} The Ohio Supreme Court has interpreted the phrase "substantial impairment" to mean "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Zeh*, 31 Ohio St.3d at 103-04, 509 N.E.2d 414. "'Substantial impairment'" need not be proven by expert medical testimony." *State v. Hillock*, 7th Dist. Harrison No. 02-538-CA, 2002-Ohio-6897, ¶ 21. "It may be proven by the victim's own testimony, allowing the trier of fact to observe and evaluate the victim's ability to either appraise or control his conduct, and by

___

[2] McIntosh also complains that the trial court did not permit defense counsel to cross-examine T.M. about whether she is sexually active, however, he did not assign this as error.

18.

the testimony of others who have interacted with the victim." *State v. Kilbarger,* 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 11, citing *State v. Bai,* 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206, ¶ 54; *State v. Daniels,* 9th Dist. Summit No. 25808, 2011–Ohio–6414, ¶ 6. "A substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder." *Kilbarger* at ¶ 11*,* citing *Bai* at ¶ 53, citing *State v. Brown,* 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428.

{¶ 50} In *State v. Moore*, 5th Dist. Richland No. 2020 CA 0038, 2021-Ohio-287, ¶ 5, *appeal not allowed*, 163 Ohio St.3d 1429, 2021-Ohio-1721, 168 N.E.3d 525, the Fifth District Court of Appeals found that there was evidence of substantial impairment where the 16-year-old victim had double bronchial pneumonia as an infant, resulting in delayed mental development; she required occupational therapy to refine her motor skills, physical therapy to help her walk, and was currently in speech therapy; and she had an IQ of 46, was on an IEP at school, and as part of her IEP, she had a special needs teacher who attended classes with her at all times.

{¶ 51} In *State v. Keeley*, 4th Dist. Washington No. 11CA5, 2012-Ohio-3564, the Fourth District Court of Appeals found that the jury did not lose its way in finding the victim substantially impaired where the state presented testimony that the victim had an IQ between 50 to 60, her mother said she had the mind of a six to nine-year-old child and had been appointed her guardian; the nurse who examined the victim said that she acted like an eight-year-old; her counselor believed she had an emotional age of five to seven

19.

years old; and the doctor who participated in her guardianship proceedings opined that she functioned at the level of a seven or eight-year-old.

{¶ 52} And in *Kilbarger*, the Twelfth District Court of Appeals found that the jury did not lose its way in finding that the victim was substantially impaired. There, a psychologist testified that the victim had significantly below average cognitive functioning, was slow mentally, had difficulty grasping abstract concepts, had mild or moderate retardation, and was impaired in his ability to understand the implications of choices and long term consequences of actions. Similarly, the special education director for the victim's school testified that he had an IQ of 70 or below, was mentally retarded, had adaptive deficits that impaired his ability to problem solve or think things through, and she had recommended that he be placed in a guardianship. The court observed, also, that the jury was able to observe the victim testify and was able to assess his mental condition and his ability to appraise or control his conduct.

{¶ 53} Here, there was sufficient evidence presented that T.M.'s ability to resist or consent to sexual conduct was substantially impaired because of a mental condition. While McIntosh offered evidence to the contrary—e.g., that T.M. babysits, that he did not know that she saw a counselor, struggled with school, or took medication, and that she is permitted to leave the house without adult supervision—this created an issue to be resolved by the jury. *See State v. Robinson*, 9th Dist. Summit No. 21317, 2003-Ohio-

20.

5360, ¶ 14 ("When inconsistencies exist in the testimony, it is the trier of fact's responsibility to weigh the evidence and assess the witnesses' credibility.").

### 3. McIntosh's Awareness of T.M.'s Substantial Impairment

{¶ 54} Finally, McIntosh claims that the state failed to present evidence that McIntosh was aware that T.M. had a mental condition that constituted a "substantial impairment." He claims that the state's evidence showed that McIntosh knew T.M. her whole life and knew that T.M. "ran her mouth at school" and got into trouble, was subject to discipline at her school, ran away from home, and sometimes displayed disrespect for her mother and for house rules. But he contends that T.M.'s outward appearance "could not have put anybody on notice that she was substantially impaired." He again points to the fact that T.M. was permitted to care for young children. McIntosh insists that he did not know that T.M. was on an IEP, went to counseling, or took medication. And although he acknowledges that there were times he lived with T.M. and her family, he maintains there was no evidence that he knew about her special education, helped her with homework, drove her to counseling, or helped manage her medication.

{¶ 55} The state responds that McIntosh was well aware—or should have been well aware—of T.M.'s substantial impairment because he spent a considerable amount of time with the family, had been at T.M.'s home hundreds of times, and even lived with the family multiple times for five or six months at a time. It also emphasizes that T.M.'s demeanor was consistent with that of an eight-year-old child and was "open and obvious

21.

for everyone," including McIntosh. McIntosh knew T.M. sucks her thumb, and he was aware of her behavioral issues. The state insists that all this evidence, if believed by the jury, was sufficient to establish that T.M. was substantially impaired and McIntosh knew this.

{¶ 56} In *Keeley,* 4th Dist. Washington No. 11CA5, 2012-Ohio-3564, appellant was convicted of raping his neighbor, who was around 24 or 25 years old. As summarized above, the state presented testimony that the victim had an IQ between 50 to 60, her mother said she had the mind of a six to nine-year-old child and had been appointed her guardian, the nurse who examined her said that she acted like an eight-year-old, her counselor believed she had an emotional age of five to seven years old, and the doctor who participated in her guardianship proceedings opined that she functioned at the level of a seven or eight-year-old. A family friend testified, however, that the victim acted like a 16-year-old, and the appellant—who had known the victim since she was ten or 11 years old and was friends with her family—said that she acted like she was 16 to 18 years old and behaved more child-like only when she was around her mother.

{¶ 57} Appellant challenged the jury's determination that he knew or had reasonable cause to believe that the victim's ability to resist or consent was substantially impaired because of a mental condition. The court held that the issue was one to be determined by the jury. The court explained that the jury had viewed the witnesses who

22.

testified about the victim's mental capability, and also observed the victim testify, therefore, it could formulate its own conclusions as to the victim's mental age.

{¶ 58} Here, too, the jury saw and heard T.M. testify. The state presented testimony from T.M.'s mother, who said that she received social security income due to T.M.'s disabilities, and T.M. does not function at her age, was qualified as a student with cognitive disabilities, takes special classes at school, and has an IEP. It presented testimony from the SANE nurse who described that T.M. appeared child-like, sucked her thumb, and did not seem like a typical 16-year-old. It presented testimony from a clinical therapist who believes that T.M. is cognitively delayed and always will be, functions at the level of an eight or nine-year-old, carries a teddy bear and sucks her thumb, has impaired social skills, has boundary issues, is easily influenced, plays with kids much younger than she is, is unable to think long-term, has poor hygiene, and should be under the care of a guardian. And it presented testimony from the detective, who observed that T.M. seemed to function at the level of an eight-year-old and not a 16-year-old. This was sufficient evidence, which, if believed, would support a conclusion that McIntosh—who knew T.M. her whole life and had even lived with her—knew or had reasonable cause to believe that T.M.'s ability to resist or consent to sexual conduct was substantially impaired because of a mental condition.

{¶ 59} In sum, we find that the state presented sufficient evidence that sexual conduct occurred, that T.M.'s ability to resist or consent to sexual conduct was

23.

substantially impaired because of a mental condition, and that McIntosh knew or had reason to know of this substantial impairment. Accordingly, we find McIntosh's second assignment of error not well-taken.

### III. Conclusion

{¶ 60} R.C. 2907.02(A)(1)(c) is not void for vagueness for failure of the legislature to define "mental condition." We, therefore, find McIntosh's first assignment of error not well-taken.

{¶ 61} The state presented evidence that sexual conduct occurred, that T.M. suffered from a mental condition that substantially impaired her ability to resist or consent to sexual conduct, and that McIntosh knew this or had reasonable cause to believe this. This evidence was sufficient to support his conviction under R.C. 2907.02(A)(1)(c), therefore, we find his second assignment of error not well-taken.

{¶ 62} We affirm the August 10, 2021 judgment of the Lucas County Court of Common Pleas. McIntosh is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

24.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                              JUDGE

Christine E. Mayle, J.

                                              _____
Myron C. Duhart, P.J.                                         JUDGE
CONCUR.

                                              _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.