[Cite as *State v. Beard*, 2025-Ohio-3097.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240388 |
| | | TRIAL NO. B-2106212 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| SPENCER BEARD, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed in part, the sentence is vacated, and the cause is remanded for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed 50% to appellant and 50% to appellee.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 8/29/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Beard*, 2025-Ohio-3097.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :           APPEAL NO.   C-240388
                                                    TRIAL NO.    B-2106212
     Plaintiff-Appellee,            :

  vs.                                   :
                                                            *O P I N I O N*
SPENCER BEARD,                          :

     Defendant-Appellant.           :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Sentence Vacated, and Cause Remanded

Date of Judgment Entry on Appeal: August 29, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Candace Crear*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp,* for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Defendant-appellant Spencer Beard challenges his rape conviction and sentence in three assignments of error. First, he argues that the evidence is insufficient to prove that he knew the victim was substantially impaired. Second, he argues that the weight of the evidence proves that the victim was not substantially impaired. Third, Beard argues that the trial court impermissibly based its decision to sentence him to the statutory maximum on Beard's exercise of his constitutional right to a jury trial.

**{¶2}** We overrule Beard's first two assignments of error. First, a rational juror could find that Beard knew the victim was substantially impaired because eyewitnesses described the victim's instability on her feet, heaving, and vomiting near Beard after drinking alcohol with Beard earlier in the night. Second, Beard's conviction, and the jury's finding of a substantial impairment, is not contrary to the weight of the evidence. The victim's and eyewitnesses' testimony describing the victim's condition before the sexual conduct reveal that alcohol impaired the victim's ability to apprise and control her conduct, and a conviction is not against the manifest weight of the evidence simply because the jury believed the victim's and eyewitnesses' testimony and not Beard's testimony.

**{¶3}** But we sustain Beard's third assignment of error. The trial court's repeated condemnatory remarks about Beard's not-guilty plea and his choice to be tried by a jury reveal that it impermissibly considered Beard's exercise of his constitutional right to a jury trial when it imposed the maximum penalty. A sentence imposed in retaliation for the defendant's exercising his constitutional right to a jury trial is contrary to law and must be vacated.

**{¶4}** Therefore, we affirm Beard's conviction, vacate his sentence, and remand the cause to the trial court for resentencing.

### *I.* *Factual and Procedural History*

**{¶5}** In late 2021, the State charged Beard with one count of rape of a substantially-impaired person, J.F., in violation of R.C. 2907.02(A)(1)(c). Beard pleaded not guilty and elected for a jury trial.

### *Beard's trial*

**{¶6}** At trial, J.F. explained that she had been separated from her husband when she reconnected with an old friend from high school, Brady. J.F. was led to believe that Brady was single and their messages became flirtatious. One weekend in September 2021, Brady invited J.F. out to a bar.

**{¶7}** J.F. testified that she does not drink much, if at all. J.F.'s medications include Adderall, Xanax, and acne medication. On the day J.F. was to meet up with Brady, J.F. had little to eat due to a poor appetite, but she took an Adderall early in the day and a Xanax around 9:30 p.m. because she was feeling anxious. According to J.F., that was the first time she had taken a Xanax since receiving her prescription.

A. *Beard joined Brady at the bar*

**{¶8}** Around 10:30 p.m., J.F. met Brady at the Casual Pint in Hamilton, Ohio. There, J.F. met Brady's friend, Beard, and Beard's friend, Marissa. Brady bought J.F. a drink. Brady testified that he bought J.F. a White Claw, while J.F. and Beard recalled it being an IPA. Beard described J.F. as shy at the Casual Pint.

**{¶9}** The four decided to go to Big Buls in Ross, Ohio. While Beard drove, J.F. and Marissa drank White Claws in the backseat. Brady and J.F. testified that, at Big Buls, Beard bought one shot of tequila each for J.F. and Marissa, and a vodka lemonade for himself. According to J.F. and Marissa, J.F. drank both shots of tequila. J.F. recalled drinking most of Beard's vodka lemonade.

**{¶10}** While his companions were inside drinking, Brady was outside arguing with his girlfriend on the phone. When the group left Big Buls, Marissa recalled that Brady had to help J.F. walk from the bar to Beard's car.[1] But Brady testified that he did not "recognize" that J.F. was intoxicated at Big Buls.

**{¶11}** According to Brady, Beard suggested going back to his apartment in Reading, Ohio. Brady and J.F. sat in the back while Beard drove to his apartment. J.F. felt the effects of the alcohol on the way to Beard's apartment and started "blacking in and out." Brady and J.F. kissed. According to Brady, J.F. was "having more fun, getting a little bit louder than before." At trial, he testified that she was tipsy, but not "sloppy." When the State asked Brady why he had described J.F. as "sloppy" to detectives during a police interview, Brady clarified that J.F.'s kiss was "sloppy," not her demeanor.

### B. *Beard's apartment*

**{¶12}** J.F. recalled being in Beard's apartment sometime around midnight and vomiting in Beard's bathroom. She did not remember walking into Beard's apartment. From that point on, J.F. only remembered "bits and pieces."

**{¶13}** J.F.'s sister-in-law, Caitlyn, testified that she had been texting J.F. throughout the night. Caitlyn asked J.F. if everything was "okay," and J.F. responded that she was "having a good torn [sic] for real." The next message from J.F. was "discombobulated and didn't make sense." Caitlyn believed that J.F. was intoxicated at that point. Caitlyn tracked J.F.'s location through J.F.'s phone and, at around 12:20 a.m., J.F.'s phone was in Reading, Ohio. Caitlyn called J.F., but there was no answer.

**{¶14}** Brady testified that he was at the apartment for 30 minutes, at most. Brady and J.F. sat in Beard's bedroom to give Beard and Marissa, who were having a

---

[1] Beard testified that J.F. needed no help leaving Big Buls.

5

tense conversation, some privacy. According to Brady, Marissa rejected Beard's advances and wanted to leave Beard's apartment. Marissa testified that she called her mother to pick her up. This, according to Brady and Marissa, upset Beard.

{¶15} Brady and J.F. were talking when, according to Brady, J.F. started "dry heaving." Brady recalled guiding J.F. to the bathroom and Marissa came to assist J.F. Marissa testified that J.F. was "very intoxicated at that point" and was vomiting within the first ten minutes that she was in Beard's apartment. Marissa recalled that J.F. "stumbled" into the bathroom and she held J.F.'s hair as J.F. vomited. According to Marissa, J.F. was "laying on the bathroom floor like she couldn't really hold herself up or anything" and could not clean herself up. Marissa also testified that J.F. had trouble walking after she vomited.

{¶16} Beard testified that he walked into his bedroom to retrieve Marissa's purse and saw J.F. "on top of [Brady]" on Beard's bed. Beard remembered J.F. going into the bathroom because she felt unwell, so Beard, a nurse, went into his living room.

{¶17} When Brady was about to leave Beard's apartment, J.F. had "a Pop-Tart" and water, though Brady did not see her eat the Pop-Tart. Marissa left five minutes before Beard drove Brady to his car. At that point, J.F. was on the couch, fully clothed, and "[l]ying against the cushion." Brady recalled that Beard gave J.F. a "puke bucket." As Brady was leaving the apartment J.F. said, "Wait, Don't. Are you sure, like, is it okay?" Brady assured J.F. that she would feel better after sleeping.

{¶18} Marissa recalled that J.F. "was too drunk to be left [] alone" and that Brady remarked that he did not want to take advantage of J.F. in that state. Brady testified that, around the time he left, he "wouldn't see anyone having sex with [J.F.]" considering her state. Marissa left Beard's apartment believing that Brady was going to drive J.F. home.

6

C. *J.F. slept at Beard's apartment*

{¶19} Beard testified that he returned to his apartment and J.F. had "one boot and one leg of her pants off laying like catty-corner across" Beard's bed. Her pants were "way too tight" and he "couldn't get 'em on," so he gave her sweatpants. She was "mutter[ing] stuff" and told Beard, "I don't feel good." J.F. was, for the most part, standing up straight. Beard helped J.F. into his bed and then went into his living room to watch television.

{¶20} Beard recalled that J.F. received text messages from her family, but she ignored them. Yet, he testified that she checked to see how much an Uber would cost to take her back to her apartment. Beard acknowledged at trial that he told an officer, "Like, I could have got her an Uber, but I'm really going to leave someone who can't lift their head up with a stranger?"

{¶21} Beard explained that he and J.F. talked for two-and-a-half hours about family and relationships. He recalled J.F. assuring him that it was okay if they slept in the same bed.

{¶22} Beard testified that, around 4:00 a.m., J.F. "rolled over, kissed [Beard] on the cheek," thanked Beard for taking care of her, and started "cuddling." According to Beard, J.F. initiated sexual contact, took off her clothing, and initiated sexual intercourse. Beard testified at length describing sexual intercourse with J.F., in graphic detail.

D. *The next morning*

{¶23} J.F. recalled waking up the next morning "scared" and in Beard's bed, next to Beard. Her shirt was on, though it "looked like maybe they tried to get it off." Her "bra was undone in the back" and she "had no pants on no shoes on or socks on, no underwear on." She explained that her pants were "super tight" and difficult to get

off. She recalled that her pants, underwear, and pantyliner looked like they were "peeled . . . straight down." J.F. woke Beard and asked about Brady. Beard informed J.F. that Brady had left "last night." Beard stood up and "didn't have boxers on."

**{¶24}** According to Beard, J.F. woke up around 5:45 a.m. to go to the bathroom, "got dizzy and lightheaded," and fell onto his bathroom floor. Beard helped J.F. and then packed her clothes in a bag to take her home. J.F. asked Beard why she was in his apartment and "where was [Brady]?" Beard shook his head in response.

**{¶25}** J.F. recalled that her vagina felt sore on the drive home, as if "something happened." She asked Beard if he had "touched" her. Beard said no, that she had sex with Brady, and "fell and hit [her] head." This, to J.F., just "wasn't adding up." When Beard felt the back of J.F.'s head, she started having "flashbacks." She testified that she began recalling "someone on top of me. Like, me telling somebody 'No'; me – someone turning me on my stomach; somebody yanking my boots off of me. And like, they're like combat boots; they lace up, they zip up, they're not easy to get off or get on." J.F. recalled saying "Brady?" when that person was "tugging" on her boots. She also remembered "someone like, putting, like, pressure on my chest [] and [] asking me if I was on birth control." J.F. learned from Beard that he had driven Brady to his car after the night wound down, and Brady did not come back for J.F. because he "had to go back to his girlfriend."

**{¶26}** According to Beard, he told J.F. that they did not have sexual intercourse because Beard was "in more shock than anything" after their night together. Beard saw "no indication of her, like, slurring words or being confused."

E. *Rape kit*

**{¶27}** Later that morning, J.F. explained her suspicions to her mother and Caitlyn. Caitlyn testified that J.F. was "distraught" and "freaking out." J.F. also texted

8

and called Brady, who assured J.F. that they had not engaged in sexual intercourse and suggested she "get a rape kit."

{¶28} J.F. and Caitlyn went to the hospital. There, J.F. spoke with Nurse Rhyan, a Sexual Assault Nurse Examiner ("SANE"). J.F. told Nurse Rhyan that she woke up and felt "like she was being, like, tugged or, like, pulled off the bed and her, like, boot was being taken off. And she said 'Braden,' and they responded to 'yes.'" Then J.F. recalled waking up and "feeling like someone was behind her doing sexual things and, she remembers them saying, 'Are you on birth control?'" J.F. told Nurse Rhyan that she was "pretty positive" that she had sex with Brady, that Brady left, she later awoke to someone "having sex with [her]," and she told that person "no."

{¶29} The SANE report states that J.F. had consensual sex with Brady the night before. J.F. testified that she agreed to a urinalysis because she recalled feeling "paralyzed," like she "couldn't move," and that she "was drugged." Nurse Rhyan also collected swabs to test for DNA. J.F. tested negative for alcohol, but positive for amphetamines and benzodiazepine. Lab testing of J.F.'s vaginal swabs revealed the presence of DNA from two contributors—J.F. and Beard. The lab analyst testified that Beard's DNA was a "sperm fraction" and "rarer than one in one trillion unrelated individuals." Brady was excluded as a contributor to the DNA on the vaginal swab.

*F. Interrogation*

{¶30} Brady testified that J.F. messaged him about her suspicions, which led to Brady confronting Beard. Beard acted "confused," denied having sex with J.F., and failed to mention to Brady that he slept in the same bed as J.F. But sometime around the DNA testing, Beard confessed to Brady, "Yeah, we had sex." That change to Beard's story "didn't make sense" to Brady, who wished Beard had told "the truth upfront," but Brady understood why his friend might hesitate to tell him about the sex. Beard

9

told Brady that the sexual intercourse was consensual and happened after Beard and J.F. "talked all night" and "had a heart-to-heart."

**{¶31}** Beard explained that he denied having sex with J.F. to Brady and law enforcement because he had called a "prepaid legal hotline, and they told me not to discuss – discuss anything with anybody." Beard testified that Brady continued speaking with J.F. because Brady wanted to "keep [J.F.] from telling his girlfriend."

**{¶32}** Officer Eric Leininger interrogated Beard; that interrogation was played at trial. Beard denied being naked in bed with J.F. and having sex with J.F. Beard told officers that when J.F. asked if she and Beard had engaged in sexual intercourse the night before, he responded, "You were throwing up hugging the trash can." Beard said that Brady had carried J.F. to the bathroom because she had started dry heaving.

**{¶33}** In his interview, Beard likened J.F. to a "floppy fish" when he returned to his apartment after dropping off Brady. He said that taking J.F.'s jeans and boots off was difficult. He also said that J.F. vomited several times and fell and hit her head in his bathroom. Beard told officers that J.F. struggled to walk to his truck the next morning. After officers secured a search warrant, Beard gave a DNA sample.

### G. *Toxicology experts*

#### 1. Dr. Topmiller

**{¶34}** Robert Topmiller was the chief toxicologist for the Hamilton County Coroner's office and testified as a forensic-toxicology expert. Topmiller was not surprised that J.F.'s urine tested negative for alcohol because the hospital tested it "approximately 14 hours" after the "incident," and alcohol begins to "eliminate from your blood and urine" once drinking stops. J.F. was 5'6" and 135 pounds, and Topmiller determined that J.F.'s blood-alcohol concentration ("BAC") "after 75 minutes of drinking would have been somewhere between 0.116 and 0.187." The legal

driving limit in Ohio "is .080" and the "higher tier OVI limit" is 0.17. Topmiller agreed that J.F.'s computed BAC could have increased between 12:30 to 1:00 a.m. because "even though you stopped, you can still be absorbing a little more."

{¶35} Topmiller found, based on that computed BAC and to a reasonable degree of scientific certainty, that J.F. was "cognitively impaired." He clarified that cognitive impairment includes "not thinking as clearly and as quickly," slowed visual processing, slower reactions to stimuli, diminished attention, and critically diminished judgment. According to Topmiller, J.F. would have shown signs of psychomotor impairment, including "drowsiness, coordination troubles, maybe walking, slurred speech." Topmiller expected the alcohol's effect on J.F. to have been more pronounced because she is a nondrinker. He testified that, while J.F.'s body's elimination of alcohol would have lowered her computed BAC to 0.128 at roughly 4:45 a.m., J.F. would have showed signs of cognitive impairment and diminished judgment and control.

{¶36} Topmiller described the effects of mixing Xanax, alcohol, and Adderall. He believed that J.F. likely experienced pronounced drowsiness, mental confusion, and coordination issues. As a nonregular user of Xanax, the effects of that drug would have been "more pronounced" and surfaced between 1:00 and 3:00 a.m. Topmiller agreed with J.F.'s primary care physician's conclusion that J.F.'s dosage of Xanax was unlikely to have caused her to blackout. Topmiller explained that Adderall, a stimulant, would have made J.F. more aware of her surroundings. But when Adderall is combined with alcohol, the drugs do not balance each other out and, instead, there is "an increased likelihood and severity of side effects associated with each drug."

2. Dr. Plotnick

**{¶37}** Dr. Harry Plotnick, a toxicologist, testified in Beard's defense. In Plotnick's opinion, there is "no way to tell" whether a hypothetical person in a situation identical to J.F.'s was impaired to a certain degree because of variables such as that person's tolerance for alcohol, and the concentration of Xanax and Adderall in their system. He testified that J.F.'s computed BAC "would have been no higher than .176, which is well below the area that you would have memory problems." Plotnick testified that blackouts are "not very common," and J.F.'s computed BAC is not associated with memory loss or blacking out.

**{¶38}** Plotnick agreed that a Xanax taken at 9:30 p.m. likely had an additive effect to the alcohol consumed by a casual drinker. But he believed that J.F.'s dosage presented a low likelihood of causing blackouts or paralysis. Plotnick explained that Adderall and alcohol "moderate" each other. He found it interesting that Topmiller noticed the presence of acetone in J.F.'s urine, because acetone is typically linked to untreated diabetes or "people who have been starved and therefore their bodies are making acetones or ketones . . . which could also have affected [J.F.]." The presence of acetone also risks vomiting. Plotnick agreed that an empty stomach, a Xanax, and drinking for two hours "[p]robably would have been" a bad combination.

## *Verdict and sentencing*

**{¶39}** The jury found Beard guilty of rape in violation of R.C. 2907.02(A)(1)(c). Following a long colloquy, the trial court sentenced Beard to "11 to 16 and a half years in prison."

## II.    *Analysis*

**{¶40}** Beard raises three assignments of error on appeal. First, he argues that the evidence was insufficient to convict him of rape. Second, he maintains that his

conviction is against the manifest weight of the evidence. Third, he contends that his sentence is the product of improper bias.

**{¶41}** Beard was convicted of rape in violation of R.C. 2907.02(A)(1)(c), which, relevant here, criminalizes

> sexual conduct with another when . . . [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition . . . and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition . . . .

**{¶42}** No statute defines "substantially impaired," but the Supreme Court of Ohio defines the phrase as "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). A person's "voluntary intoxication is a mental or physical condition that could cause substantial impairment." *State v. Foster*, 2020-Ohio-1379, ¶ 42 (8th Dist.); *see State v. Gasper,* 2023-Ohio-1500, ¶ 63 (1st Dist.), citing *State v. Yerkey*, 2021-Ohio-3331, ¶ 29 (7th Dist.).

### A. *Sufficient evidence proved that Beard knew J.F. was substantially impaired*

**{¶43}** Beard argues that the State's evidence failed to establish that he knew J.F. was substantially impaired, an element of rape under R.C. 2907.02(A)(1)(c).

#### 1. Sufficiency and knowledge

**{¶44}** To review whether sufficient evidence established an element of a criminal offense, this court, viewing the evidence and reasonable inferences in a light most favorable to the State, determines if a rational fact finder could have found, beyond a reasonable doubt, all essential elements of the offense. *State v. Sipple*, 2021-

13

Ohio-1319, ¶ 6 (1st Dist.), quoting *State v. MacDonald*, 2019-Ohio-3595, ¶ 12 (1st Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist. 1983).

**{¶45}** To prove that Beard knew J.F. was substantially impaired, the evidence must establish that Beard was "aware that such circumstances probably exist." R.C. 2901.22(B). Sexual conduct becomes criminal under R.C. 2907.02(A)(1)(c) "'when the individual knows or has reasonable cause to believe that the victim's ability to resist or consent is substantially impaired because of voluntary intoxication.'" *State v. Doss,* 2008-Ohio-449, ¶ 13 (8th Dist.)*,* quoting *State v. Martin,* 2000 Ohio App. LEXIS 3649, *16 (3d Dist. Aug. 14, 2000).

**{¶46}** Fact finders may infer a defendant's knowledge of a person's substantial impairment by looking to the person's demeanor and interactions. *State v. McClain*, 2025-Ohio-962, ¶ 26 (8th Dist.). Courts have identified behaviors that a person would recognize as clues of another person's alcohol-induced substantial impairment, including "'stumbling, falling, slurr[ing] speech, passing out, or vomiting.'" *State v. Sims*, 2023-Ohio-1179, ¶ 134 (4th Dist.), quoting *State v. Hatten*, 2010-Ohio-499, ¶ 24 (2d Dist.).

2. <u>The State presented sufficient evidence to establish knowledge</u>

**{¶47}** According to Beard, the evidence fails to show that he knew or should have known that J.F. was substantially impaired because he was unaware that J.F. had taken a Xanax, J.F. had consumed a limited amount of alcohol, and he did not observe her vomiting or being unsteady on her feet.

**{¶48}** We hold that the State presented sufficient evidence to establish Beard's knowledge of J.F.'s substantial impairment. Marissa testified that J.F. needed help walking from Big Buls to Beard's car and then to the bathroom in Beard's studio apartment. Marissa, Brady, and Beard all testified that J.F. was dry heaving in Beard's

apartment. Marissa and J.F. testified that J.F. vomited. Significantly, Marissa recalled that J.F. was "laying on the bathroom floor like she couldn't really hold herself up or anything." J.F. was unable to clean herself up after vomiting and had trouble walking.

**{¶49}** Before Beard left to take Brady to his car, Beard gave J.F. a "puke bucket" in case she vomited. Brady testified that J.F. was lying "against a cushion" on Beard's couch when he left Beard's apartment. Beard testified that he returned home from driving Brady to find J.F. with "one boot and one leg of her pants off laying like catty-corner across" Beard's bed. J.F. "muttered stuff" and said, "I don't feel good."

**{¶50}** Moreover, Beard told law enforcement that he had told J.F. the next morning that she had been "throwing up hugging the trash can." He compared J.F. to a "floppy fish" at the time he returned to his apartment after dropping off Brady. He also told officers that J.F. vomited several times, "tumbled headfirst," and hit her head in his bathroom. Finally, Beard told the officers that J.F. had struggled to walk to his truck the next morning.

**{¶51}** A rational juror could have determined that Beard knew that J.F.'s ability to consent to sexual intercourse was diminished based on J.F.'s vomiting, unsteadiness, and behavior throughout the night. Therefore, Beard's conviction is supported by sufficient evidence. We overrule the first assignment of error.

B. *The weight of the evidence established J.F.'s substantial impairment*

**{¶52}** Beard argues that the jury's finding that J.F. was substantially impaired is contrary to the manifest weight of the evidence and maintains that she was not impaired and the sexual intercourse was consensual.

1. Manifest-weight review

**{¶53}** To reverse a conviction as against the manifest weight of the evidence, we "review the entire record, weigh the evidence and all reasonable inferences,

15

consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Champion*, 2021-Ohio-4002, ¶ 14 (1st Dist.). Reviewing courts should not sustain manifest-weight challenges except in "exceptional case[s]" where "the evidence weighs heavily against the conviction." *State v. Nicholson,* 2024-Ohio-604, ¶ 71.

**{¶54}** Again, a "substantial impairment" is "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct." *Zeh,* 31 Ohio St.3d at 103-104. But the phrase "substantial impairment," as used in R.C. 2907.02(A)(1)(c), is "not synonymous with intoxication." *Foster,* 2020-Ohio-1379, at ¶ 44 (8th Dist.); *see Doss,* 2008-Ohio-449, at ¶ 18 (8th Dist.) ("there can be a fine, fuzzy, and subjective line between intoxication and impairment.").

**{¶55}** Courts consider several factors to determine whether the evidence proves a victim's substantial impairment, including the amount of alcohol consumed by the victim, whether the victim had difficulty remembering the incident, and whether there was evidence of "stumbling, falling, slurred speech, passing out, [and] vomiting." *State v. Lasenby*, 2014-Ohio-1878, ¶ 28 (3d Dist.), quoting *Hatten*, 2010-Ohio-499, at ¶ 18 (2d Dist.); *see Sims*, 2023-Ohio-1179, at ¶ 128 (4th Dist.). But "not 'every case requires proof of an unconscious, vomiting, staggering, or slurring victim.'" *State v. Baikov*, 2020-Ohio-4876, ¶ 18 (12th Dist.), quoting *State v. Freeman*, 2011-Ohio-2663, ¶ 19 (8th Dist.).

    2.  <u>Beard's conviction is not contrary to the weight of the evidence</u>

**{¶56}** The weight of the evidence, including Marissa's, Brady's, and Beard's accounts of J.F.'s condition, demonstrated J.F.'s substantial impairment. A victim's

16

substantial impairment may be proved "by the testimony of people who have interacted with the victim." *State v. Brady*, 2007-Ohio-1453, ¶ 78 (8th Dist.). While Brady and Beard testified that J.F. did not need assistance walking, Beard described her as a "floppy fish" to law enforcement and said she struggled to walk the next morning. Marissa testified that J.F. needed help walking from Big Buls. Marissa and Brady both testified that J.F. was dry heaving in Beard's studio apartment. Marissa testified that J.F. vomited, and Beard told officers that she vomited several times and "tumbled headfirst" in his bathroom at one point. And Brady and Beard testified that Beard gave J.F. a trash can in case she needed to vomit.

**{¶57}** Consistent with Beard's theory that J.F. was not impaired and consented to sexual intercourse, Beard emphasizes the absence of alcohol in J.F.'s uranalysis results, her remark to the SANE nurse that she had consensual sex with Brady that night, Plotnick's testimony that J.F.'s alcohol levels were not consistent with memory loss, testimony that J.F. did not need assistance leaving Big Buls or getting to Beard's apartment, Marissa's and Brady's decisions to leave J.F. in Beard's apartment, and J.F.'s accepting a ride home from Beard.

**{¶58}** But Topmiller was not surprised that J.F.'s urine test failed to reveal the presence of alcohol because that test occurred the following afternoon, which was enough time for J.F.'s body to metabolize and eliminate the alcohol that she had consumed. While Plotnick expressed skepticism about the association between J.F.'s calculated BAC and memory loss, J.F. also had consumed a Xanax, which both Topmiller and Plotnick explained is "additive" and amplifies the effects of alcohol.

**{¶59}** While J.F. reported to Nurse Rhyan that she'd had consensual sex with Brady the night before, Caitlyn's, J.F.'s, and Brady's testimony reveal that J.F. was attempting to piece together what happened the night before. And Nurse Rhyan

17

testified that J.F. was not "definitely sure." J.F. clarified, at trial, that she reported having consensual sex with Brady because she knew they had kissed and "[Beard] told me that me and [Brady] had sex."

**{¶60}** And while Beard and Brady testified that J.F. did not need help walking from Big Buls to Beard's car, "evidence that a rape victim displayed some awareness, or could ambulate from one location to another, does not negate a finding of substantial impairment." *Sims*, 2023-Ohio-1179, at ¶ 129 (4th Dist.). Beard's conviction is not against the weight of the evidence simply because the jury found his and Brady's testimony less credible. *See State v. Jackson*, 2024-Ohio-2728, ¶ 17 (1st Dist.), quoting *State v. Robinson*, 2019-Ohio-3144, ¶ 30 (12th Dist.). While credibility is relevant to a manifest-weight inquiry, the jury "'is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections—observations that are critical to determining a witness's credibility.'" *State v. Bentz*, 2017-Ohio-5483, ¶ 98 (3d Dist.), quoting *State v. Williams*, 2013-Ohio-573, ¶ 31 (8th Dist.).

**{¶61}** Beard's conviction is not against the manifest weight of the evidence. The jury was entitled to believe the State's evidence and disbelieve Beard's evidence. We overrule the second assignment of error.

C. *The trial court's comments at sentencing reveal an improper bias*

**{¶62}** In his third assignment of error, Beard challenges two aspects of his sentence. First, he argues that the trial court's statements during sentencing illustrate a bias against Beard based on his exercise of his constitutional right to a jury trial. Second, he argues that the trial court failed follow R.C. 2929.19(B)'s notice provision.

1. Sentences cannot be enhanced as a "trial tax"

**{¶63}** The Sixth Amendment to the United States Constitution guarantees a person accused of a crime the right to a trial "by an impartial jury." A defendant's right

to a jury trial is "'a fundamental reservation of power in our constitutional structure.'" *State v. Hand,* 2016-Ohio-5504, ¶ 33, quoting *Blakely v. Washington,* 542 U.S. 296, 305-306 (2004). The jury, as guaranteed by the Sixth Amendment, "stand[s] between a defendant and the power of the State." *Id.*, quoting *Shepard v. United States*, 544 U.S. 13, 25 (2005) (plurality opinion). The right to a jury trial is an ancient right tracing back to the common law and "'guard[s] against a spirit of oppression and tyranny on the part of rulers,' and '[i]s the great bulwark of [our] civil and political liberties.'" *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000), quoting 2 J. Story, *Commentaries on the Constitution of the United States*, 540-541 (4th Ed. 1873).

**{¶64}** In Ohio, a trial court fashioning a criminal defendant's sentence must be "guided by the overriding purposes of felony sentencing." R.C. 2929.11(A). A sentence must be consistent with "the seriousness of the offender's conduct and its impact upon the victim." R.C. 2929.11(B). To determine the seriousness of the defendant's conduct, the trial court must consider the severity of the harm suffered by the victim because of the offense. R.C. 2929.12(B)(2). The defendant's likelihood of recidivism is relevant to the defendant's sentence, and the defendant's lack of "genuine remorse for the offense" is indicative of the potential to recidivate. R.C. 2929.12(D)(5).

**{¶65}** The United States Supreme Court has held that "a sentencing authority may legitimately consider the evidence heard during trial, as well as the demeanor of the accused." *United States v. Grayson*, 438 U.S. 41, 50 (1978). Ohio's sentencing statutes "do not preclude the sentencing court from considering serious misbehavior by a defendant as observed by the sentencing court during trial." *State v. O'Dell*, 45 Ohio St.3d 140, 147 (1989). Citing *Grayson,* the Supreme Court of Ohio held that "when a sentencing judge is the same judge who presided over the defendant's trial,

19

the defendant's act of lying under oath is a factor that may be considered along with other pertinent factors when imposing sentence." *O'Dell* at 148.

**{¶66}** But a trial court may not "punish a person because he has done what the law plainly allows." *State v. Rahab*, 2017-Ohio-1401, ¶ 8, quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A sentence is contrary to law (and constitutes an impermissible "trial tax") when the trial court "vindictively imposed [the sentence] on a defendant for exercising his constitutional right to a jury trial." *Id.*

**{¶67}** Ohio courts employ a two-part test to cases where the trial court "creat[es] the appearance that it enhanced a defendant's sentence because he elected to go to trial." *State v. Morris*, 2005-Ohio-962, ¶ 13 (4th Dist.), quoting *State v. Hobbs,* 2003-Ohio-4338, ¶ 71 (8th Dist.). When a trial court's statements create an inference that the trial court impermissibly imposed a trial tax when sentencing the defendant, we must vacate the sentence unless the record includes "an unequivocal statement that the defendant's decision to go to trial was not considered in imposing the sentence." *Id.* In doing so, we must "review the entire record—the trial court's statements, the evidence adduced at trial, and the information presented during the sentencing hearing[.]" *Rahab* at ¶ 19. A court may vacate a sentence based on a "trial tax," only when the evidence clearly and convincingly shows that the trial court impermissibly imposed the sentence based on vindictiveness. *See id.*

**{¶68}** Ohio courts have vacated sentences as impermissibly vindictive where the trial court explicitly connected the harsher sentence to the defendant's decision to go to trial. In one case, the trial court told the defendant:

> [Y]ou had an opportunity to do the right thing, which is to admit your culpability, and you did not do it . . . I want you to know, had he been willing to enter a plea on this case, he would have been afforded

probation. He wouldn't have gone to the institution. But now you're going to the institution.

*State v. Scalf,* 126 Ohio App.3d 614, 623 (8th Dist. 1998). The *Scalf* court held that "these remarks create the appearance that defendant was given a more severe sentence in order to punish him for exercising his right to a trial" and vacated the sentence. *Id.*

**{¶69}** Another sentence was determined to be the result of vindictiveness where the trial court was "angry that [the defendant] elected to go to trial," and described the defendant as "try[ing] to jam up the system" and wasting taxpayer dollars. *Morris* at ¶ 14. Critically, the trial court in *Morris* referenced the defendant "ple[ading] not guilty and [having] 'put the State to the test and they have proven it'" as an aggravating factor for the defendant's sentence. *Id.* The *Morris* court held that these statements revealed a jury-trial enhancement of the defendant's sentence and nothing in the record suggested otherwise. *Id.* at ¶ 15. So, it vacated the sentence and remanded the case for resentencing. *Id.*

**{¶70}** And a sentence was held to be the product of vindictiveness where the trial court remarked to the defendant that a guilty defendant's choice to have his case tried by a jury was an "abuse" and a waste of the jurors' time. *State v. Fritz*, 2008-Ohio-4389, ¶ 31 (2d Dist.). The *Fritz* court vacated the sentence because the trial court's "comments suggest[ed] that a trial by jury is an option available only for those who are innocent and not a constitutional right." *Id.*

2. The trial court's statements indicated a "trial tax"

**{¶71}** The trial court imposed an indefinite 11-to-16-and-a-half-year sentence, the maximum sentence for a first-degree felony under R.C. 2929.14(A)(1)(a).

**{¶72}** At the sentencing hearing, J.F. addressed the trial court and thanked her family for appearing at court "because I know this has been hard on them just as

much as it has been hard on me." The trial court commended J.F. for assisting in the prosecution because "a lot of time [the victims] won't show up for trial" and "will give up because they are so frightened."

**{¶73}** Before announcing its sentence, the trial court remarked that Beard "put [J.F.] through" three difficult experiences:

> So first she gets raped, then on, it's horrible, and then she goes to the hospital, which that's a horrible thing. Then she has to go over it with [law enforcement]. Then she has to come in, in front of the Grand Jury. Then she has to come in and talk about it again in front of all the jurors, which is tough, but she did it.
>
> *He could have avoided all of that by taking that plea* to obstructing justice, a Felony 3, and he would not have to register. It would keep her off the stand. *So he punished her.*
>
> His continued denial caused her to go through this over again, which is horrible, as you know.

(Emphasis added.)

**{¶74}** The trial court chastised Beard for failing to admit his guilt and "victimiz[ing] [J.F.] again" when J.F. "had to listen to [Beard] lie about that." Because of Beard, J.F. "had to testify in front of 12 people." Beard "had the opportunity to plead this out, wouldn't do it." Beard

> victimized [J.F.] again[] and then victimized her this last time by telling this horrible, creepy story about how–you know, what planet are you on that you think anybody would believe that story, anybody would believe this attractive woman would ever have sex with you voluntarily. No way. You are creepy. No way this woman would have anything to do with you.

**{¶75}** Some of the trial court's statements at the sentencing hearing address Beard's lack of remorse and J.F.'s fortitude. A defendant's lack of remorse is relevant to a sentencing decision. But a defendant's decision to plead not guilty and elect to have the State try its case before a jury is irrelevant to sentencing. The trial court's repeated references to Beard's decision to refuse to accept a guilty plea and instead exercise his Sixth Amendment right to a jury trial reveal that a vindictive or retaliatory motive influenced the trial court's sentence.

**{¶76}** A defendant's "constitutional right to require the Government to proceed to a conclusion of the trial and to establish guilt by independent evidence should not be exercised under the shadow of a penalty. . . . To impose upon a defendant such alternatives amounts to coercion as a matter of law." *United States v. Tateo*, 214 F.Supp. 560, 567 (S.D.N.Y. 1963). As other courts have observed, "'courts must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice.'" *State v. Elson,* 311 Conn. 726, 775 (2014), quoting *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1973).

**{¶77}** The trial court's imposition of the maximum sentence, on its own, was not problematic. Had it been clear that the trial court considered only the evidence, Beard's lack of remorse, and Beard's trial behavior, the trial court would have been well within its discretion in imposing the maximum sentence. We hold, however, that because the trial court indicated that its sentence was based on Beard's election for a jury trial, that sentence was contrary to law. We sustain the third assignment of error, vacate Beard's sentence, and remand this cause for resentencing.

### III.    Conclusion

**{¶78}** We overrule the first two assignments of error and affirm the conviction. We sustain the third assignment of error, vacate the sentence, and remand the cause to the trial court for a resentencing hearing consistent with this opinion.

Judgment accordingly.

**KINSLEY, P.J.,** and **MOORE, J.,** concur.